No. 65,616

KERRY KNUDSEN, *Appellant*, v. KANSAS GAS AND ELECTRIC COMPANY, A CORPORATION, *Appellee*.

(807 P.2d 71)

Opinion filed March 1, 1991.

*Jim Lawing*, of Wichita, argued the cause and was on the brief for appellant.

*J. Michael Peters*, of Kansas Gas and Electric Co., argued the cause, and *Stephen W. Cavanaugh* and *Patrick C. Smith*, of Fisher, Cavanaugh & Smith, P.A., of Topeka, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Kerry Knudsen, plaintiff-appellant, contends that Lyle Koerper, Manager-Corporate Communications for Kansas Gas and Electric Company (KG&E), defendant-appellee, defamed his character and reputation at a meeting among Kansas City Star editors, KG&E personnel, and Kansas City Power and Light (KCPL) personnel. Knudsen appeals the trial court's determinations that (1) his news story made him a public figure; (2) the statements were business communications made in good faith among individuals with a corresponding interest in the subject matter of the communications, and were, therefore, subject to a limited privilege; (3) the statements were not malicious; and (4) defendant's motion for summary judgment should be granted.

Knudsen is the author of a story titled, "Wolf Creek accepts help on cooling lake but freezes out fishermen," that the Kansas City Star purchased and published in its sports section. The article discusses KG&E's policy regarding public access to the the Wolf Creek Nuclear Generating Station cooling lake for recreation. Knudsen is identified in the article's byline as the author, vice president of the Outdoor Writers of Kansas, and a graduate student in journalism at the University of Kansas. Knudsen's article had previously been published in the Olathe Daily News. In response to the Olathe article, both a KG&E attorney and Koerper contacted Knudsen with their concerns that the story contained inaccurate facts and misleading statements.

Subsequent to the Star's publication of Knudsen's article, Koerper requested and obtained a meeting with the Kansas City Star editors Joe McGuff, editor-in-chief; Brent Frazee, outdoor editor; and Greg Clark, assistant sports editor. Koerper, KG&E's manager of corporate communications and spokesperson for Wolf Creek, is quoted by Knudsen in both articles. KCPL, one of the co-owners of Wolf Creek, was represented at the meeting by Joe Kramer, a public information specialist for KCPL.

During the meeting, Koerper informed the Star editors that Knudsen's article contained misstatements and discussed the Star's failure to verify the information with KG&E officials prior to publication. Following the meeting, Koerper wrote an inter-office memo which states:

"Report on a conference with Kansas City Star editors including Joe McGuff, executive editor of the Star and Times; Brent Frazee, outdoor editor; and Greg Clark, another sports department editor.

"Subject: Inaccuracies of the April 6 Star sports page article by Kerry Knudsen on Wolf Creek Reservoir.

"My evaluation of this session was that it was very productive in that McGuff acknowledged that not only did the Star err in printing the story without verifying information with utility officials, but that the story itself is in error. McGuff raised the question of what should be done to correct the situation. My indication was that we were primarily concerned with what we could expect in the future from the Star-Times in covering complicated utility issues. If we issued a news story in the future about the reservoir or invited reporters to the site we would expect Star-Times reporters to cover the story in a professional way and they would have the advantage of greater insight into constraints faced by utilities involved in nuclear projects. It's important to understand that Mr. McGuff was only appointed to the top editorial position on these newspapers within the last three weeks. He previously was executive sports editor. It is also obvious that he is a thoughtful and experienced professional journalist.

"The meeting (April 17, 1986) ran from 11:00 am to 12:20 pm. Joe Kramer of Kansas City Power & Light and I participated. Joe is a longtime acquaintance/friend of McGuff.

"Frazee indicated that Knudsen had submitted the article in a standard way for purchase by the Star. Apparently Clark worked directly with Knudsen indicating at several points that he had as many as 11 telephone calls with Knudsen on checking information. Our continuous response was, why didn't you ask us? At the conclusion of the conference when McGuff was summarizing indicating clearly that the story was not a good one and the actions of Star representatives left something to be desired, he asked Frazee and Clark their conclusion. The first response of the two, especially Clark, was ambiguous. But, they soon agreed with Mr. McGuff as he continued to draw out their conclusions.

"I made it clear in concluding that we had to assume that Kerry Knudsen was an adversary and had forfeited the right to claim to be a professional journalist. We would point to the Kansas City Star article as an example of his willingness to print untrue information and to distort it to make an adversarial position.

"Joe Kramer continually raised the issue of why the Star would not use their own people on an adversarial story. It's one thing to buy from a freelance writer a basic informative piece, and quite another to buy from a freelance writer a piece as obviously adversarial as this is.

"My opening statement was that Wolf Creek Station has been a major news story for more than 10 years. The utilities have issued news releases. But, probably the majority of news has been generated with reporters asking questions of the utilities. Many of the questions have come through the reporter being contacted by persons making some claim or allegation. We

have appreciated being able, in most cases, to respond to the allegations before stories were run.

"The April 6 story on Wolf Creek reservoir raised two issues. 1) Is the story factually correct; we believe not. 2) The newspaper did not contact us to verify the information prior to running the story.

"The Star article is essentially a rewrite of articles printed March 26 and 27, 1986, in the Olathe Daily News. Kerry Knudsen, the reporter, talked with me on March 24, 1986 and at that point he indicated that he could not tell me where the stories would be run. After seeing the Olathe stories, I called Knudsen on April 3, 1986. I provided some additional information to him, actually correcting some information I had given to him on March 24, and indicated that I was very disappointed in the Olathe stories. He was aware of the inaccuracies. I was disappointed that he had selected the Olathe Daily News to perpetuate information that he knew was inaccurate. His response, 'Is that it?' My response to him, 'That's it.' That concluded that telephone conversation.

"For 10 years, sometimes even on a daily basis, we have talked with Star and Times reporters on the Wolf Creek project. In September, 1985, Barbara Musfeld of the Star was onsite and at that time talked with an associate of mine at some length about the fish population of the reservoir. On October 14, 1985, Barbara and I talked on the telephone about several issues, including the lake. I explained to her at that time that the essential function of the Wolf Creek reservoir was to serve the needs of the plant. Owners were, however, interested in the possibility of the lake someday being open to the public. I would be happy to talk with her about it sometime. I concluded, 'let me know what you want to do.'

"As I reported at this meeting, the last we heard from the Star, was seeing the article printed on April 6.

"The issue here is not if we at KG&E or KCPL are disappointed in the Olathe article or the article ran by the Star. The issues center in, is the article correct, was the procedure proper as followed by the Star in not giving us an opportunity to respond to the allegations before the story was run.

"After this opening statement on my part, Kramer indicated that a concern of his centered in the newspaper buying an advocacy piece from a freelancer as opposed to doing the story themselves.

"We discussed the news story nearly paragraph by paragraph. I indicated that we felt the evidence pointed to Knudsen's overstressing the role of the Fish and Game Commission. Clark indicated that two weeks before this article ran there was a piece printed whereby the Fish and Game people were complaining about lack of funds. He said that he felt that this article was more of a criticism of Fish and Game than the utilities. Clark said that one week Fish and Game complains that they don't have any money and then here is [evidence] that they have spent funds on a preferential basis to utilities.

"We indicated that although the NRC quotes were correct, they are a distortion of the facts. Not only did I explain to Knudsen the complicated procedure of satisfying regulatory commitments, but I understood he had talked with Paul O'Conner of the NRC in Washington who explained the regulatory process. I indicated that my understanding was that the conversation with Mr. O'Conner took place on April 3. This means that Knudsen knew that his quotation of Mr. Hunnicut was a distortion.

"We discussed in detail the regulatory process of a nuclear plant. We indicated that the support for the reservoir from Fish and Game was essentially of the consultative, information type support, although that we continually invited Fish and Game people to observe activities ranging from poisoning of fish to stocking and testing. Invariably this activity would result in people from Fish and Game actually assisting, but actual work performed was limited and it seemed more logical that they participate in the activity as opposed to simply standing around watching what was going on. Wolf Creek station pays millions of dollars in taxes and there is no reason why a state agency such as Fish and Game could not be expected to provide services. We could not see that we had placed a financial burden on the agency and it seemed only prudent that we go to the closest source of expertise. And, it is also true that we did not always follow their suggestions. We had decided in 1975 that we would develop a reservoir ourselves while keeping in close contact with Fish and Game. But, the expense of developing the reservoir, the fish, etc. was that of the utilities.

"We emphasized the things that the utilities did at LaCygne. Kramer pointed out other examples of KCPL making available power plant facilities for recreation purposes. We emphasized that these activities reflect the intent of the utilities and our past record. Calling the Neosho lake an executive retreat is simply wrong and Knudsen knew it.

"I indicated that in terms of his quotation of me saying that I would not deny that there was a possibility that the lake could be used as an executive retreat, I said I made a mistake in not answering the question directly. My approach was to show that the question wasn't even a valid one and to reduce it to the point of absurdity. But, Knudsen obviously wanted a yes or no answer. My answer was to refer to the intent of the utilities that we have given in public statements for years, point to LaCygne and suggesting that we needed time before [an] actual decision about final use of the lake could be made.

"As was indicated earlier, I think that Clark was the last 'believer' and apparently he is the person who worked directly with Kerry in the story. Frazee was generally quiet but seemed much more willing to accept the things we were saying. But most important, Mr. McGuff seemed to have little difficulty in appreciating the position of the utilities and as we were leaving the office, he was talking with Frazee and Clark, we assume about the conversation.

/s/ L. Koerper"

Prior to trial, KG&E moved for summary judgment, claiming

Koerper's statements at the meeting were covered by a qualified privilege and were made without malice. The district court found that the statements made at the business meeting were covered by a qualified privilege and that by writing the article Knudsen caused himself to become a limited public figure. It then determined that under either scenario Knudsen had failed to prove actual malice as required and granted summary judgment to KG&E. Knudsen's appeal was transferred from the Court of Appeals to the Kansas Supreme Court.

Knudsen points out that Koerper has no privilege to communicate defamatory information if he knows the information is false or with a reckless disregard for the truth. *Polson v. Davis*, 635 F. Supp. 1130, 1148 (D. Kan. 1986). Knudsen argues that the memorandum was in reality a smoking gun that shows Koerper's intent to maliciously defame Knudsen's journalistic reputation. Knudsen alleges that Koerper's statements that (1) Knudsen's article is "an example of his [Knudsen's] willingness to print untrue information and to distort it to make an adversarial position," and (2) Knudsen "had forfeited the right to claim to be a professional journalist" are slander per se; therefore, a jury should decide whether Koerper's intent when making the statements was malicious. In addition, he claims that the angry tone Koerper used in making the statements to the Star's staff is important to show that the statements were made with the intent to injure Knudsen's professional reputation.

Kansas and other states previously followed the common-law rule dividing slander into slander per se and slander per quod. Slander per se involved words from which malice was implied and damage was conclusively presumed to result. General damages from such a publication arose by inference of law and the plaintiff was not obliged to establish damage by proof. After the United States Supreme Court decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), Kansas no longer permitted recovery based upon the establishment of slander per se.

## WAS KNUDSEN A PUBLIC FIGURE?

Knudsen claims that the trial court erred in finding he was a limited public figure. He argues that he cannot achieve a limited public figure status by simply writing a news story that carried

his byline. To support his argument, Knudsen cites *Gertz v. Robert Welch, Inc.*, 418 U.S. at 352.

In *Gertz*, after a police officer had been convicted of murder, the attorney who represented the murder victim's family in a civil suit against the officer was discussed in a magazine article which inaccurately (1) portrayed the attorney as an architect of a "frame-up" of the officer, (2) implied that the attorney had a criminal record, and (3) identified the attorney as a "Leninist," a "Communist-fronter," and a former official of a Marxist organization. In the attorney's libel action against the publisher of the magazine, the United States District Court submitted the case to the jury under instructions that withdrew from the jury consideration of all issues except the measure of damages. The jury awarded $50,000 to the plaintiff. On further reflection the district court concluded that the First Amendment rule, requiring proof of defendant's knowledge of the falsity or reckless disregard of the truth of the defamatory statements, protected discussion of any public issue without regard to the status of the plaintiff as a public officer or public figure. Accordingly the district court entered judgment n.o.v. for defendant. The United States Court of Appeals for the Seventh Circuit affirmed.

On *certiorari*, the United States Supreme Court reversed and remanded the case for a new trial. The Court held that (1) the First Amendment protection afforded news media against defamation suits by public persons is not extended to defamation suits by private individuals even though the defamatory statements concern an issue of public or general interest; (2) so long as states do not impose liability without fault, they may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual; (3) defamation plaintiffs who do not prove the First Amendment rule are restricted to recovery of compensation for actual injury, excluding punitive damages; (4) the plaintiff-attorney was neither a public official nor a public figure within the First Amendment rule and has a remedy for defamation without having to prove the publisher had knowledge of the false statements or recklessly disregarded the truth of the defamatory statements; and (5) a new trial was necessary because the jury was allowed

to impose liability without determining fault and to presume damages without proof of injury.

Knudsen argues that the publication of his article in a newspaper does not give others the right to destroy his professional reputation. Knudsen claims that the district court's determination that he became a limited public figure creates a dangerous precedent in that all writers, journalists, and columnists who publish articles will forfeit their status as private individuals.

"There are two types of public figures: (1) All-Purpose Public Figures—those persons who occupy positions in society (not only in government) of 'persuasive power and influence' or achieve pervasive fame and notoriety. (2) Limited-Purpose Public Figures—those who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. *Steere v. Cupp*, 226 Kan. 566, 572, 602 P.2d 1267 (1979)." *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 600, 738 P.2d 1246 (1987).

In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, the United States Supreme Court defined public figure status as compared with that of private individuals. The Court pointed out that public officials accepted as one of the necessary consequences of involvement in public affairs the risk of closer public scrutiny than might otherwise be the case. *Gertz*, 418 U.S. at 344. It noted that private individuals relinquish no part of their interest in the protection of their own good name. *Gertz*, 418 at 345. And then it found that some private persons relinquish that interest to some degree by voluntarily injecting themselves into a limited range of public issues with the result that they thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issue involved which invites attention and comment. *Gertz*, 418 U.S. at 345, 351. Unlike Gertz, Knudsen was not a private person who was involuntarily exposed to a public figure status. See *McDowell v. Paiewonsky*, 769 F.2d 942 (3d Cir. 1985) (architect who chooses to become involved in controversy surrounding government projects is a public figure). *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (en banc) (professional football player is a public figure for statements regarding professional's ability to play). Contra *Wolston v. Reader's Digest Ass'n., Inc.*, 443 U.S. 157, 61 L. Ed. 450, 99 S. Ct. 2701 (1979) (nephew of a couple arrested for

espionage was not a public figure); *Hutchinson v. Proxmire*, 443 U.S. 111, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979) (scientist criticized by Senator for waste of government grants is not a public figure); *Time, Inc. v. Firestone*, 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976) (a party to a divorce action was not a public figure).

The common defamation case is initiated by the subject of the story against the reporter who authored the article and/or the newspaper which published the article. While neither Knudsen nor KG&E cite a reported decision where the defamation action is commenced by the reporter, this court refers to another jurisdiction's decision with a similar issue.

In *Pearson v. Fairbanks Publishing Co.*, 413 P.2d 711 (Alaska 1966), Pearson, a syndicated newspaper columnist, brought a libel action against a publisher who made unfavorable editorial comments about Pearson's column. Pearson's July 7, 1958, syndicated column described the then Governor of Alaska as a "Johnny-Come-Lately" in promoting statehood for Alaska and attributed success of the statehood movement to another. In response, the Fairbanks Publishing Company on July 8, 1958, published an editorial entitled "The Garbage Man of the Fourth Estate" criticizing Pearson's accuracy. In another editorial, Fairbanks Publishing Company again referred to Pearson as a garbage man and advised it would no longer carry Pearson's column because it did not wish to distribute garbage in its newspaper. The Alaska Supreme Court found that the article on Alaska's statehood was of public interest and a quid pro quo existed between Pearson writing an article which then allows another to state their judgment, opinion, comment, or criticism on the position taken by Pearson.

The Alaska Supreme Court stated "[t]he evidence justifies a finding that appellee's [Fairbanks] characterization of appellant [Pearson] as a garbage man and of his writings as garbage was not made with knowledge that it was false or with a reckless disregard of whether it was false or not." *Pearson*, 413 P.2d at 715. Pearson's claim that such "garbage" statements injured his reputation was not allowed to prevail. While *Pearson* involved a written editorial, Koerper's statements at the meeting with the Star editors are similar. Koerper had only responded with his view about Knudsen's article. Like Pearson, Knudsen is in no

position to complain just because Koerper's opinion, comments, or criticisms are adverse to his article.

Recently, in *Rybachek v. Sutton*, 761 P.2d 1013 (Alaska 1988), the Supreme Court of Alaska found that an owner of a gold mine who had articles that appeared in the opinion section of a mining newspaper was a limited public figure as to issues concerning natural resources and mining in Alaska. The article contained a disclaimer by the paper that the views expressed by Rybachek did not necessarily represent those of the mining newspaper.

The Alaska Supreme Court found that Rybachek voluntarily injected herself into public issues with regard to those articles she authored for the opinion column along with her involvement in various mining associations. A reader did not agree with one of Rybachek's articles and had asserted that Rybachek had polluted the water quality and referred to her as a "flagrant violator." *Rybachek*, 761 P.2d at 1013. The Supreme Court of Alaska affirmed the trial court's grant of summary judgment, finding that there was nothing in the record to indicate that the reader acted with reckless disregard for the truth or falsity. *Rybachek*, 761 P.2d at 1015. Knudsen's action is very similar to *Rybachek* as both plaintiffs became limited public figures by voluntarily injecting themselves into a public controversy by writing articles and being officers of professional associations.

In contrast to *Rybachek* is *Buckley v. Littell*, 394 F. Supp. 918 (S.D.N.Y. 1975). Buckley brought an action for libel against the author of a book who had characterized him as "an outstanding representative" of the function of "fellow traveler" with respect to fascism in the United States. The court found that such statements were libelous per se made with reckless disregard of truth and, although Buckley was a public figure as a journalist, he was entitled to protection.

One's participation in public and professional affairs does not create a public personality for all aspects of that person's life. The designation of an individual as a "public figure" is a question of law. The nature and extent of an individual's participation in a particular controversy giving rise to the defamation determines if an individual is a "public figure." *Ruebke v. Globe Communications Corp.*, 241 Kan. at 600; *Hanrahan v. Horn*, 232 Kan. 531, 533, 657 P.2d 561 (1983). An individual may become a public

figure if he thrusts himself or his views into public controversy to influence others. See *Hutchinson v. Proxmire*, 443 U.S. at 135.

Though Wolf Creek is a public issue, Knudsen argues that he did not become a public figure by authoring the article about Wolf Creek. He claims his exposure to the public issue was involuntary and, therefore, he cannot be transformed into a public figure. We disagree. Knudsen, a free-lance writer, was not assigned to write the article by an employer. Rather, after defining the topic of the article, he initiated the investigation. Knudsen should have realized that his article about Wolf Creek would create a legitimate concern not only for KG&E but also for the public at large. He wrote the article under his byline in an investigatory tone to create a public controversy and influence the issue of the public's right to use Wolf Creek's cooling lake. By his choice, Knudsen voluntarily injected himself into the public's attention and caused KG&E's concern.

Even if Knudsen was entitled to a private individual's status, he cannot prevail. In *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 86 L. Ed. 2d 593, 105 S. Ct. 2939 (1985), the United States Supreme Court expanded protection for speech claimed to be defamatory by making a distinction between speech on matters of public concern and speech on matters of private concern in relationship to a private individual. The Court permitted recovery of actual and punitive damages in defamation cases absent a showing of actual malice when the defamatory statements do not involve matters of public concern. Since Knudsen's article was devoted to a public concern rather than a private concern, he cannot prevail even if he had maintained his private individual status.

### WERE THE STATEMENTS SUBJECT TO A QUALIFIED PRIVILEGE?

Knudsen claims that the trial court erred in holding that Koerper's statements are within the qualified privilege. Communications are entitled to an absolute privilege, a limited privilege, or no privilege. An absolute privilege is granted to those in the legislative, executive, or judicial capacity by constitution, by legislative enactment, or by law as determined by the courts. A

limited privilege is granted to those with a special interest or a duty in the subject matter of the communication.

Public figures, like public officials, are individuals who voluntarily expose themselves to be the subject of numerous and varied communications. Both public officials and public figures have better access to the media and other channels of communications than does a private individual and can readily respond to communications attacking their character. They are perceived as having less need for protection from communications. *Redmond v. Sun Publishing Co.*, 239 Kan. 30, 33, 716 P.2d 168 (1986).

Certain communications are recognized as privileged and as such are not within the rules imposing liability for defamation. The defense of privilege is a matter of public policy in the furtherance of the right of free speech. The underlying idea is that by reason of a public or social interest that is entitled to protection, immunity is granted from liability for defamation that otherwise would be actionable. Privilege does not destroy the actionable character of a defamatory communication, but is available only by way of defense. *Gobin v. Globe Publishing Co.*, 216 Kan. 223, 226, 531 P.2d 76 (1975) (citing 50 Am. Jur. 2d, Libel and Slander § 192 p. 695).

Legal authorities have found that qualified or conditional privilege exists under the following criteria:

"Conditional or qualified privilege is based on public policy. It does not change the actionable quality of the words published, but merely rebuts the inference of malice that is imputed in the absence of privilege, and makes a showing of falsity and actual malice essential to the right of recovery.

"The qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest. The *essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.* The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty. The *transmitter must have an interest or duty in the subject matter, and the addressee must have a corresponding interest or duty,* but such duty may be moral or social, rather than a legal one. The defense of qualified privilege does not extend to a publication to the general public.

"In determining whether conditional privilege exists, the nature of the subject, the right, duty, and interests of the parties, the time, place, and circumstances of the occasion, and the nature, character, and extent of the communication should be considered. It has been held that a conditional privilege to reveal information to protect a sufficiently important interest has its origin in, and is governed by, the rule of good sense and customary conduct of people motivated by good will and proper consideration for others, including due consideration for the subject being informed about as well as the recipient being protected." 50 Am. Jur. 2d, Libel and Slander § 195. (Emphasis added.)

Conversely, a qualified privilege does not exist if the privilege is abused. There is no privilege if the publication is made primarily for the purpose of furthering an interest that is not entitled to protection, or if the defendant acted principally through motives of ill will, or if he acted recklessly. 50 Am. Jur. 2d, Libel and Slander § 197.

The availability of a limited privilege is generally restricted to those situations where public policy is deemed to favor the free exchange of information over the individual's interest in his or her good reputation. One such qualified privilege exists with respect to business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication. *Turner v. Halliburton Co.*, 240 Kan. 1, 7-8, 722 P.2d 1106 (1986). Where there is no dispute as to material facts, the question of whether a publication complained of is privileged is a question of law to be decided by the court. *Turner v. Halliburton Co.*, 240 Kan. at 8; *Senogles v. Security Benefit Life Ins. Co.*, 217 Kan. 438, 443, 536 P.2d 1358 (1975); *Gobin v. Globe Publishing Co.*, 216 Kan. 223; *Munsell v. Ideal Food Stores*, 208 Kan. 909, 921, 494 P.2d 1063 (1972).

In *Welch v. Chicago Tribune Co.*, 34 Ill. App. 3d 1046, 340 N.E.2d 539 (1975), a sportswriter brought a libel action against the newspaper that had employed him and its sports editor. Welch was notified of his dismissal by a letter signed by the sports editor, following which a memo was posted on a bulletin board allowing the newspaper staff and anyone who entered to read the reasons for Welch's termination, which were listed as "alcoholism, inefficiency, lack of punctuality, and unreliability." *Welch*, 34 Ill. App. 3d at 1046.

The appellate court of Illinois found that the trial court erred in granting the newspaper's motion for summary judgment as the distribution of the memo by posting it on the bulletin board was malicious and the allegedly defamatory statement could not be given an innocent construction. 34 Ill. App. 3d at 1052-53. Knudsen cites several similar cases regarding interoffice memos. See *Pirre v. Printing Developments, Inc.*, 468 F. Supp. 1028 (S.D.N.Y. 1979); *Dillard Dept. Stores, Inc. v. Felton*, 276 Ark. 304, 634 S.W.2d 135 (1982); *Tumbarella v. The Kroger Co.*, 85 Mich. App. 482, 271 N.W.2d 284 (1978).

His reliance on these cases is misplaced. Unlike the facts in *Welch*, Knudsen failed to show the widespread distribution of Koerper's statement that occurred in *Welch*. Koerper used one of the Star's procedures for receiving complaints, *i.e.*, a meeting. Koerper's statements at the meeting were confined to a subject matter of concern both to the Star's editors and KG&E. Koerper fulfilled his job responsibilities to KG&E by making known to the Star's editors KG&E's concerns about the article. Attendance at the meeting was limited to those who had a managerial interest in the article. Koerper's action in requesting the meeting was proper and his distribution of the memo was limited to KG&E management. The trial court correctly determined Koerper's statements were business communications made in good faith among individuals who had a corresponding interest in the subject matter and were within a limited privilege.

## STANDARD OF REVIEW

Knudsen claims that even if he is a limited public figure and Koerper's statements were business communications, the trial court erred in concluding that there was no evidence of malice. In *Ruebke v. Globe Communications Corp.*, 241 Kan. 595, 602, 738 P.2d 1246 (1987), this court adopted the standard announced by the United States Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986), that the standard for determining the existence of malice at the summary judgment stage in a libel action sought by a "public figure" requires the individual under the First Amendment to prove by clear and convincing evidence that the defendant acted with "actual malice, a knowing or reckless disregard of the truth."

An appellate court is required to read the record in the light most favorable to the party against whom summary judgment was entered. The appellate court takes the party's allegations as true, and it gives him the benefit of the doubt when his assertions conflict with those of the movant. Factual inferences tending to show triable issues are to be considered in the light most favorable to the existence of those issues. If there is a reasonable doubt as to the existence of fact, a motion for summary judgment will be denied. Moreover, pleadings and documentary evidence must be given a liberal construction in favor of the party against whom the motion is directed. *Ruebke v. Globe Communications Corp.*, 241 Kan. at 602.

Summary judgment may be granted when the evidence shows no liability as a matter of law and where the central facts are not in dispute. *Hein v. Lacy*, 228 Kan. 249, 256, 616 P.2d 277 (1980). When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. K.S.A. 1990 Supp. 60-256(e). In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. An issue of fact is not genuine unless it has legal controlling force as to a controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact could not affect the judgment, it does not present a genuine issue of material fact. *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 246 Kan. 450, Syl. ¶ 2, 790 P.2d 404 (1990).

In general, the question of actual malice in a defamation action is a question of fact for the jury. However, under certain circumstances, a motion for summary judgment and the granting of that motion are appropriate. If the plaintiff fails to offer clear and convincing evidence of an extrinsic character to prove actual malice on the part of the defendant in the publication of a slander on a qualifiedly privileged occasion, there is no issue of material fact to be determined, and it is the duty of the trial court to grant the defendant's motion for summary judgment. See *Anderson*, 477 U.S. at 252-55; *Ruebke*, 241 Kan. at 602.

We admit that Koerper's language was critical of Knudsen's journalistic style. But the record when read as a whole is susceptible to a construction as a matter of law that Koerper's com-

ments at the meeting, although not complimentary, did not defame Knudsen's reputation but were merely critical of Knudsen's investigatory work for the article and, hence, were insufficient to show actual malice. The district court was correct in granting summary judgment.

Affirmed.