**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 24, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

DENNIS SNYDER and
AUDRA SNYDER,

      Plaintiffs-Appellants,

v.

THE AMERICAN KENNEL CLUB,

      Defendant-Appellee.

No. 09-3319
(D.C. No. 5:08-CV-04094-SAC-KGS)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO, GORSUCH**, Circuit Judges, and **ARGUELLO**,[**] District Judge.[***]
_____

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

[**] Honorable Christine M. Arguello, District Court Judge, District of Colorado, sitting by designation.

[***] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

The legal question raised on appeal is whether the district court erred by granting summary judgment to the defendant. Another question, unrelated to the legal one, but equally weighty, is "what happened to Jag?" Jag was (and perhaps still is) a Golden Retriever owned by Janis Fonceca. Plaintiffs-Appellants Dennis and Audra Snyder are professional dog handlers. They were hired by Fonceca to show Jag at an American Kennel Club ("AKC")-sanctioned event during Memorial Day weekend of 2005.

The Snyders claim that, after that weekend, Jag ran away. The AKC, however, heard evidence that Jag was accidentally hanged at that event and that the Snyders' claim was a cover-up. As a result, it suspended the Snyders from all AKC activities for a period of ten years, the "standard" penalty for the offense of cruelty under the AKC Discipline Guidelines. That decision gave rise to this lawsuit.

The Snyders sued the AKC alleging the AKC tortiously interfered with their dog handling business through its suspension of their AKC privileges. The district court granted the AKC's motion for summary judgment.[1] We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## BACKGROUND

The district court addressed the facts in detail, as reflected in *Snyder v. American Kennel Club*, 661 F. Supp. 2d 1219, 1225-30 (D. Kan. 2009). Because the parties do not

---

[1] The Snyders brought a defamation claim that was dismissed by the district court. They have not challenged that dismissal. Accordingly, we deem the issue waived. *See Finley v. Packard Company Employee Benefits Org. Income Protection Plan*, 379 F.3d 1168, 1172 n.4 (10th Cir. 2004).

take issue with the district court's recitation of facts, we do not repeat it here. Given the posture, we view the facts in light most favorable to the Snyders.

The AKC is a national organization that regulates the breeding, registration, and showing of purebred dogs within the United States. The AKC's Charter and Bylaws ("Bylaws") sets out broad "objects" for the AKC including:

> to adopt and enforce uniform rules relating and governing purebred dog events, to regulate the conduct of persons interested in breeding, registering, selling, purchasing, exhibiting and running purebred dogs, to prevent, detect and punish frauds in connection therewith, to protect the interests of its members, to publish an official kennel gazette, and generally to do everything to advance the study, breeding, exhibiting, running and maintenance of purebred dogs.

To carry out these objectives, the AKC has adopted rules that prohibit conduct prejudicial to the best interests of purebred dogs, purebred dog events, or the AKC itself. The penalties for such prejudicial conduct by clubs or individuals range from reprimand to suspension for life from all privileges of the AKC.

Among the offenses prohibited by the AKC are cruelty and neglect. The AKC defines cruelty as, "conscious action or inaction that may endanger life or cause serious health consequences to animals." It defines neglect as, "[i]nadequate care or voluntary inattention to basic needs, ignoring the safety and well being of animals because of haste or ignorance."

Dennis and Audra Snyder are professional dog handlers. During Memorial Day weekend of 2005 (May 27-30), the Snyders showed dogs at an AKC-sanctioned event sponsored by the Muskogee Kennel Club in Shawnee, Oklahoma. One of the dogs they

3

showed that weekend was a Golden Retriever named "Jag." Jag was owned by Janis Fonceca, who had hired the Snyders to show Jag.

Audra Snyder showed Jag on the first day, Friday the 27th, in Dennis Snyder's absence. Dennis Snyder arrived that evening and initially intended to show Jag on Saturday. On Saturday morning, Mr. Snyder asked Nick Nelson, a fifteen-year-old who was working for the Snyders that weekend, to put Jag on the grooming table inside the dog containment area in the back of the Snyders' rig. This area was separated from the family's living quarters by a bathroom.

In accordance with Mr. Snyder's instructions, Nick Nelson carried the grooming table inside, put Jag on it, and attached him to a noose secured to an arm of the table. The Snyders' eleven-year-old son, Kyle, was in the living quarters at the time watching his three younger siblings, one of whom was seven months old. As Mr. Snyder left the rig, he instructed Kyle to keep an eye on Jag. Mr. Snyder and Nick Nelson then left to show other dogs. Nick was to check on Jag, or bring him to the show ring when the time came. It is undisputed that Jag was left on the grooming table in a noose, without anyone in the dog containment area of the trailer to supervise him. What happened to Jag afterward is disputed.

The Snyders left Shawnee, Oklahoma on Monday after the conclusion of the dog show, and arrived in Topeka, Kansas late that evening. The next day, Tuesday, May 31, Janis Fonceca received a phone call from Audra Snyder telling her that Jag had run away while she was exercising him.

4

Weeks later, Fonceca received another call, this one in response to a flier seeking information about Jag's disappearance. The caller was Donna Nelson, the mother of Nick Nelson. Ms. Nelson told Fonceca, "I think I know what happened to [your] dog." Ms. Nelson explained that just days before Jag supposedly disappeared, she had found him unconscious, hanging by his neck from a grooming table noose in the Snyders' trailer at a dog show in Oklahoma.

Fonceca filed a complaint against the Snyders with the AKC. She claimed that the Snyders were responsible for Jag's disappearance and/or death and that, moreover, they tried to cover up the truth with their story that Jag had run away.

The AKC decided to investigate Fonceca's complaint. The AKC investigator, Jack Norton, interviewed Donna and Nick Nelson. He also interviewed the Snyders. Finally, he solicited written statements from Linda Wilson and Kimber Shields, whom the Snyders identified as having seen Jag after the alleged hanging.

In September 2006, the AKC's Management Disciplinary Committee decided to bring charges against the Snyders. The charges alleged that the Snyders committed cruelty by not obtaining medical care for Jag while he was in their care. In addition, Mr. Snyder was charged with neglect for leaving Jag on the grooming table without appropriate supervision.

In June 2007, a two-day hearing on those charges was held in Topeka by the AKC's Northwest Trial Board. The Snyders were represented by counsel, both sides presented evidence, and various witnesses testified and were cross-examined.

5

After the hearing, the Trial Board sustained the charges and suspended the Snyders from all AKC activities for a period of ten years. The Snyders unsuccessfully appealed the decision to the AKC Appeals Trial Board. They eventually filed this lawsuit seeking tort damages for interference with their dog handling business allegedly caused by the suspension of their AKC privileges. The district court granted summary judgment in favor of the AKC, which the Snyders now appeal.

## STANDARD OF REVIEW

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). Under FED. R. CIV. P. 56(C)(2), summary judgment should be entered by the district court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." On appeal,

> [w]e examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the substantive law was applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*McKnight*, 149 F.3d at 1128 (brackets and quotations omitted).

## DISCUSSION

The Snyders are appealing the judgment below only as to their tortious interference claim. To establish a claim of tortious interference with a contract or prospective business advantage, the Snyders must show:

6

(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct. [Both torts] are predicated on malicious conduct by the defendant.

*Turner v. Halliburton Co.*, 722 P.2d 1106, 1115 (Kan. 1986); *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo., Inc.*, 431 F.3d 1241, 1262-63 (10th Cir. 2005) (applying Kansas law).

The district court granted summary judgment in favor of the AKC because: (1) it found the record failed to raise a material question of fact regarding the existence of the Snyders' contracts or prospective business expectancies, or the AKC's knowledge thereof, and because (2) the Snyders failed to show the AKC acted with malice and, thus, the AKC was entitled to a qualified privilege. *Snyder*, 661 F. Supp. 2d at 1233-39. The Snyders dispute each of these grounds. Because we find the AKC's conduct was privileged, we do not address the Snyders' other arguments.

## I.     Whether The AKC Can Claim A Privilege To Suspend The Snyders

"Kansas recognizes that 'not all interference in present or future contractual relations is tortious. A person may be privileged or justified to interfere with contractual relations in certain situations.'" *DP-Tek, Inc. v. AT & T Global Info. Solutions Co.*, 100 F.3d 828, 832 (10th Cir. 1996) (quoting *Turner*, 722 P.2d at 1115). For example, a

7

defendant's interference, although it occurred, may be privileged by reason of the interests furthered by that interference. *Turner*, 722 P.2d at 1116.

Here, the Snyders concede that the AKC has a legitimate interest in enforcing its rules relating to purebred dogs and purebred dog shows, i.e., that it may "interfere" with relations governed by those rules. They argue instead that the privilege should not attach in this case because the AKC's interference was motivated by actual malice.

## II.      Whether The AKC Waived Its Privilege By Acting With Actual Malice

The concept of malice in this context derives from defamation law. *Id*. at 1112 ("In any proceeding where the plaintiff complains that he or she has been defamed, a number of affirmative defenses are available, among them privilege . . . ."). Regarding this privilege, Kansas recognizes an analogue between defamation actions and actions for tortious interference. "Occasions privileged under the law of defamation are also occasions in which interference with contractual relations may be considered justified or privileged." *Id*. at 1116. Thus, under either tort, a "privilege" may exist whereby the alleged tortious act (be it libel, slander, or interference with contract) is protected, i.e., cannot be cause for liability, given a number of factors including the specific interests involved. *Id.* at 1116-17; *Knudsen v. Kansas Gas & Elec. Co.*, 807 P.2d 71, 79-80 (Kan. 1991); *Reebles, Inc. v. Bank of Am., N.A.*, 25 P.3d 871, 876 (Kan. Ct. App. 2001).

That privilege, however, is not absolute. It is qualified. *See Munsell v. Ideal Food Stores*, 494 P.2d 1063, 1073 (Kan. 1972) (explaining difference between absolute and qualified privilege). To defeat the privilege, the Snyders must show that the AKC acted

8

with actual malice. *Turner*, 722 P.2d at 1117 ("a qualified privilege . . . requires the plaintiff to prove actual malice by the defendant[.]"). Malice is defined as acting with "actual evil-mindedness or specific intent to injure." *Id.* (quoting *Munsell*, 494 P.2d at 1073).

The Snyders argue the AKC's malice in suspending them can be inferred from three circumstances: (A) the AKC bringing charges that were previously litigated; (B) the AKC's investigator's conduct, and (C) the manner with which the AKC initiated and conducted the hearing.

### A.    The Fonceca Suit

The Snyders first argue that "the AKC has no legitimate justification for resurrecting a dismissed state court claim, relabeling those charges as 'animal cruelty,' and then retrying the same allegations in another forum to reach a desired result." This is in reference to a state court proceeding brought by Fonceca against the Snyders. We perceive a number of problems with the Snyders' contention.

First, the Snyders cite no legal authority to support this argument. This alone is grounds for disregarding it. *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) ("'A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary

9

authority, forfeits the point.'") (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990)); Fed. R. App. P. 28(a)(9)(A).

Second, although the Snyders have not asserted claims of collateral estoppel or *res judicata* on appeal, this argument implicitly resurrects those theories – previously presented to the district court – in the context of their argument that the AKC acted with actual malice. The Snyders' failure to brief these issues on appeal is also grounds for disregarding their argument. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (a failure to brief an issue on appeal constitutes waiver).

Finally, the Snyders' *res judicata* and collateral estoppel argument rests on the assumption that these doctrines are available to them. These doctrines, however, apply only if the successive "court" is a public tribunal. *See Steele v. Guardianship and Conservatorship of Crist*, 840 P.2d 1107, 1114 (Kan. 1992); *Lyon v. Harrison*, 273 P. 429 (Kan. 1929). The AKC is a private entity. Thus, we reject the Snyders' suggestion that (a) the AKC was bound by these doctrines and (b) "actual malice" can be inferred because the AKC did not apply them. Because the AKC had no obligation under these doctrines, we conclude that no reasonable jury could infer that the AKC acted with a specific intent to injure the Snyders based on the AKC's decision to bring internal charges against the Snyders for violations of its rules.

## B.     Jack Norton's Conduct

The Snyders also seek to impute the conduct of the AKC investigator, Jack Norton, to the AKC to show that the AKC acted with actual malice. The Snyders' theory

is that Norton botched the investigation into the AKC's charges by erasing the recordings he made of the Nelsons' statements, by destroying notes of his interview with the Snyders, and by failing to interview two witnesses who claimed they had seen Jag alive after the alleged hanging. Although they assert he also lied during his testimony at the hearing, they do not identify any offending testimony. Based on these contentions, the Snyders conclude that a jury could infer malice from Norton's conduct and, moreover, that the conduct should be imputed to the AKC decision makers.

For the sake of discussion, the court assumes, without deciding the issue, that Norton's conduct could be imputed to the AKC's Trial Board and Appeals Trial Board for purposes of showing that the AKC acted with actual malice when it suspended the Snyders. As to the investigation, Norton's failure to preserve his original notes and recordings from these interviews does not give rise to a reasonable inference of actual malice. Norton had no personal connection to the Snyders and the Snyders cite no testimony from the hearing suggesting he bore any personal animus towards them. Moreover, the fact that Norton did not keep the tapes from the Nelson interviews is immaterial – both Nelsons testified at the hearing. In the same vein, Norton's failure to contact the two witnesses who supported the Snyders' statements is also immaterial – because those same witnesses, Linda Wilson and Kimber Shield, testified at the hearing. Norton's investigation – even if deficient – could not lead a rational juror to conclude that the AKC acted with a specific intent to injure the Snyders. Although a deficient investigation could lead a reasonable jury to infer that Norton was *negligent* in his

11

investigation, it could not reasonably infer that Norton was *malicious* in his investigation. Moreover, even if he were, the investigation is not what is being challenged here – rather, it is the AKC's suspension of the Snyders, over which Norton's investigation played only an introductory role. Accordingly, we reject the Snyders' contention that a reasonable jury could infer the AKC acted maliciously in suspending the Snyders because its investigator may have acted negligently.

## C.     The AKC's Conduct

Finally, the Snyders cite the manner in which the AKC conducted its investigation and hearing as evidence of actual malice. In support they cite a portion of the AKC's bylaws and an AKC pamphlet, which essentially state that it is the Event Committee's duty to deal initially with acts such as the alleged hanging.[2] This would have been the Muskogee Kennel Club – the local Oklahoma club that sponsored the at-issue dog show. Because the Muskogee Kennel Club neither investigated the charges nor brought them against the Snyders, the Snyders suggest this evidences actual malice in the AKC's decision to suspend them.

---

[2] Each AKC-sanctioned event must have its own "Event Committee," which is tasked with enforcing the AKC's rules during the event and has the authority to impose penalties for violations. Event Committees respond to complaints made at the event and generally conduct hearings on the same day as a complaint is lodged.

The Snyders, however, ignore other portions of the AKC's bylaws. In addition to the Event Committees' role in handling disciplinary issues that arise at AKC-sanctioned events, the bylaws allow individuals to make a complaint directly to AKC headquarters. That is what happened here. Upon receipt of such a complaint, the bylaws provide that the President of the AKC's Board of Directors "shall cause the matter to be investigated." The decision to bring the charges against the Snyders was made by the AKC's Management Disciplinary Committee, which was appointed by the AKC president. On these facts, no reasonable jury could infer that the AKC acted with a specific intent to injure the Snyders.

## CONCLUSION

Accordingly, we conclude the district court did not err in granting summary judgment to the AKC. We thus affirm its judgment.

Entered for the Court

Christine M. Arguello
District Judge

13