2 Cal.Rptr.3d 436 (2003)
110 Cal.App.4th 1210
Nikki FINKE, Plaintiff and Respondent,
v.
The WALT DISNEY COMPANY et al., Defendants and Appellants.
No. B160267.
Court of Appeal, Second District, Division Seven.
July 28, 2003.
As Modified July 31, 2003.
Review Granted November 12, 2003.
*443 Christensen, Miller, Fink, Jacobs, Glasser, Weil & Shapiro, Patricia L. Glasser, Ronald E. Guttman and Craig H. Marcus, Los Angeles, for Defendant and Appellant The Walt Disney Company.
O'Donnell & Shaeffer, Pierce O'Donnell, Carolee E. Handler, Clyde M. Hettrick, Los Angeles, and Daniel H. Rylaarsdam for Plaintiff and Respondent.
JOHNSON, Acting P.J.
California's SLAPP statute provides in relevant part a court may strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue[.]"[1] The principal question in this appeal is whether a defendant moving to strike a cause of action under the SLAPP statute must show all of the acts alleged to give rise to a cause of action were in furtherance of the defendant's First Amendment rights in connection with a public issue or whether it is enough to show at least one of such acts meets these criteria.
We reaffirm our conclusion in Fox Searchlight Pictures, Inc. v. Paladino "a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one `cause of action.'"[2] Therefore we hold the trial court erred in ruling the SLAPP statute does not apply to the present case. We further hold, however, the plaintiff has demonstrated a reasonable probability of prevailing on the merits of all but two of her causes of action. Therefore we will reverse the trial court's order denying the motion to strike and remand the cause to the trial court with directions to grant the motion as to certain causes of action and deny it as to the remainder.

FACTS AND PROCEEDINGS BELOW
The case before us is an offshoot of the long-running litigation between the Walt Disney Company and a literary agency over merchandising rights to the Winnie the-Pooh charactershoney allegedly worth billions.[3]
In the course of the Pooh litigation the plaintiff moved for sanctions against Disney for destroying approximately 40 boxes of records which, according to the plaintiff, contained admissible evidence or could have led to the discovery of admissible evidence in support of its claims. The trial court found in destroying the records Disney "engaged in a misuse of the discovery process" and acted in "bad faith." The court imposed evidentiary sanctions on Disney and ordered it to pay plaintiffs reasonable attorney fees and costs in bringing the motion in the sum of $90,000.
The plaintiff in the case before us, Nikki Finke, is a newspaper reporter who had a *444 contract with the New York Post to write stories about the entertainment industry for the Post's business section. Finke's editor assigned her the story about the sanction orders in the Pooh litigation. He also assigned her a companion article on the efforts of the plaintiff in the Pooh litigation to revoke Disney's license to sell Winnie-the-Pooh merchandise. Both articles appeared in the same edition of the Post.
According to Finke's complaint, the day after her Pooh articles appeared Disney officials commenced a campaign of letters and telephone calls to the Post's editors and upper management complaining Finke was biased against Disney and her articles contained factual inaccuracies. Approximately two weeks after it published the Pooh articles the Post fired Finke. Finke's editor told her she was being fired because of the Pooh articles.
Finke offered evidence to show that after the Post fired Finke, Disney's spokesperson told a reporter for the Village Voice there were "serious factual errors" in Finke's stories. The Village Voice article also quoted Daniel Petrocelli, the attorney representing Disney in the Pooh litigation, as stating portions of Finke's reporting were "recklessly inaccurate," "critical parts of the articles were false," and Finke's presentation was "one-sided and biased."
Finke filed this action against Disney alleging interference with contract and prospective business advantage, libel and slander, infliction of emotional distress and unfair business practices. Disney responded with a motion to strike these causes of action under section 425.16, the SLAPP statute. Disney contended its statements to the Post were speech in connection with two issues of public interest the Pooh litigation and the accuracy of news reportingand therefore entitled to protection under the SLAPP statute. It also contended Finke had no reasonable probability of prevailing on her claims. Finke conceded the Pooh litigation was a matter of public interest but argued Disney's statements were not made in connection with the Pooh litigation. Rather, they were a personal attack on her intended to further Disney's bottom line, not its right to free speech. Finke further argued even if the SLAPP statute applied to her action, she had a reasonable probability of success on the merits of her claims.
The trial court denied Disney's motion. The court concluded Disney could not invoke SLAPP protection in this case because it could not show all the acts giving rise to Finke's causes of action were done in furtherance of Disney's right to free speech. The court did not reach the question whether Finke had a reasonable probability of success on any of her causes of action.
Disney filed a timely appeal from the denial of its motion.[4]

DISCUSSION

I. A DEFENDANT MAY MOVE TO STRIKE A CAUSE OF ACTION UNDER THE SLAPP STATUTE IF AT LEAST ONE OF THE PREDICATE ACTS WAS AN ACT IN FURTHERANCE OF THE DEFENDANT'S FIRST AMENDMENT RIGHTS IN CONNECTION WITH A PUBLIC ISSUE OR AN ISSUE IN A JUDICIAL PROCEEDING.

In the discussion which follows we bear in mind two essential characteristics of *445 SLAPP motions, neither of which are in dispute. First, a SLAPP motion involves a two-pronged analysis. The defendant must show the challenged cause of action arises out of acts in furtherance of the defendant's right of petition or free speech in connection with a public issue. If the defendant satisfies this requirement the burden shifts to the plaintiff to establish a probability of success on the merits.[5] Furthermore, a SLAPP motion addresses a cause of action, not the individual allegations or theories supporting the cause of action. Therefore, neither the plaintiff nor the court can resolve a SLAPP motion by simply amending the complaint or striking out the offending allegations.[6]
In the present case, after correctly ruling a SLAPP motion may be directed to an individual cause of action,[7] the trial court posed this question: "[W]hen a single cause of action is based on multiple acts, some of which fall within the scope of section 425.16 and some of which do not, is that cause of action subject to a special motion to strike?" The court answered this question in the negative. It ruled a SLAPP motion will not lie unless the defendant can show all of the acts on which a cause of action is predicated were in furtherance of the defendant's First Amendment rights in connection with a public issue. The trial court erred.
In Fox Searchlight we addressed the question posed by the trial court in the present case. There an employer sued a former employee for disclosing confidential information to the attorneys representing her in a wrongful termination action and for refusing to return the confidential material. The employee moved to strike the employer's complaint as a SLAPP suit. The employer argued, inter alia, the employee's refusal to return the allegedly confidential material was not an act in furtherance of her right of petition or free speech. Because each cause of action in the employer's complaint included an allegation of such wrongful conduct the employer maintained each cause of action was immune from a motion to strike under the SLAPP statute.[8] We rejected the employer's argument for two separate and independently sufficient reasons. We stated we could not determine from the record before us that "as a matter of law maintenance of this material was not an act in furtherance of the employee's First Amendment right to petition.[9] We further stated even if the retention of the confidential material was not an act protected under section 425.16, "a plaintiff cannot frustrate the purposes of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of one `cause of action.'"[10]
Our holding in Fox Searchlight was followed *446 in Kids Against Pollution.[11] In that case the plaintiffs alleged the California Dental Association (CDA) was violating California's unfair competition law by engaging in conduct intended to prevent dental patients from receiving accurate information on the dangers of mercury amalgam fillings. The plaintiffs' second and third causes of action alleged the CDA was enforcing an ethics opinion which held the removal of mercury amalgam fillings from non-allergic patients "solely at the recommendation of the dentist is improper and unethical." The fourth and fifth causes of action incorporated the allegations in the second and third and further alleged the CDA was distributing brochures and other public statements which deceived the public about the health effects of dental amalgam.[12] The trial court denied the CDA's SLAPP motion. The court agreed the plaintiffs' causes of action arose out of the CDA's acts in furtherance of its right to free speech but found the plaintiffs were likely to prevail on the merits of their claims. The Court of Appeal agreed with the trial court's ruling the anti-SLAPP statute applied to the fourth and fifth causes of action even though the acts alleged arose only "in part" out of the CDA's exercise of its right to free speech.[13] "Since the fourth and fifth causes of action unquestionably are based in significant part on activity in furtherance of CDA's right of free speech, even if those causes of action are also based in part on activity that is not so protected, the burden shifts to the plaintiffs to make a prima facie showing of the merit of their claims."[14]
In the present case the trial court did not follow our holding in Fox Searchlight because it concluded a decision from the Fourth District, M.G. v. Time Warner, Inc.,[15] expressed a contrary view and was the better reasoned decision. For the reasons explained below, nothing in M.G. v. Time Warner is contrary to our holding in Fox Searchlight. Furthermore, after reexamining the question we conclude our holding in Fox Searchlight was correct.
M.G. v. Time Warner arose when the defendant used a Little League team photograph to illustrate stories about coaches who sexually molest youths playing team sports.[16] The team photograph depicted a coach, Norman Watson, who was subsequently convicted on numerous counts of committing lewd acts with children. The photograph also depicted the players on the team, some of whom had been molested by the coach, and two assistant coaches *447 who were not accused of molesting the players. The players and the coaches who appeared in the photograph, except for the molester, sued Time Warner for invasion of privacy and infliction of emotional distress.[17] Time Warner moved to strike the action as a SLAPP suit. The trial court denied the motion and Time Warner appealed. The Court of Appeal affirmed.[18]
Before discussing the two issues in the casewhether the SLAPP statute applied and whether plaintiffs demonstrated a probability of success on the meritsthe court observed: "Although we recognize that the two coach-plaintiffs probably have a weaker case than the player-plaintiffs, the anti-SLAPP statute allows a motion to strike to be made against only a cause of action, not a cause of action as it applies to an individual plaintiff. For that reason, because we hold the cause of action for invasion of privacy is valid as to some plaintiffs, for purposes of the anti-SLAPP motion, we deem it sound as to all plaintiffs."[19]
Seizing on the dictum from M.G. v. Time Warner quoted above the trial court in the present case concluded: "Because section 425.16 must target an entire cause of action, where the conduct falling within the protection of section 425.16 is not necessary to the validity of a cause of action, that cause of action must be deemed sound as to all allegations for the purpose of ruling on the motion to strike." This is a misinterpretation of M G. v. Time Warner.
There was little debate in M.G. v. Time Warner about whether Time Warner's publication of the photograph was an activity protected under section 425.16. Indeed, the Court of Appeal noted "[t]his point is nearly conceded by plaintiffs."[20] Rather, the principal issue on appeal was whether the plaintiffs could satisfy the second prong of the inquiryprobability of success on the merits.[21]
Unlike Fox Searchlight, the case of M.G. v. Time Warner did not involve a "mixed" cause of action in which some of the acts giving rise to liability were in furtherance of First Amendment rights and some were not.[22] In M.G. v. Time Warner all of the causes of action were based on the same underlying conductthe publication of a photograph to illustrate "the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest."[23] The court found "[f]reedom of the press and free speech rights are unquestionably implicated here."[24]
Instead of involving "mixed" causes of action, M.G. v. Time Warner involved "mixed" plaintiffs: "the four players who were Watson's victims, four players who *448 escaped being molested, and two adult assistant coaches who also appeared in the team photograph."[25] In the quotation from the opinion relied on by the trial court in our case the Time Warner court observed even though the claims of the two assistant coaches were "weak" it could not strike a cause of action as to some plaintiffs and not others and therefore in determining the second prong of an anti-SLAPP motion, probability of success on the merits, if a cause of action "is valid as to some plaintiffs ... we deem it sound as to all plaintiffs."[26]
Thus, in M.G. v. Time Warner the court concluded for purposes of establishing the second prong of the SLAPP statute probability of success on the meritsall the plaintiffs alleging a particular cause of action need not establish a probability of success; plaintiffs with a "weaker case" can piggy-back on the plaintiffs with a stronger case.
In the present case, the trial court reasoned if satisfying the second prong of the SLAPP statute requires all of the plaintiffs to have a reasonable probability of success on the merits (even though the court can fudge this requirement as to the "weaker" plaintiffs) then satisfying the first prong of the statute requires all of the defendant's activity to have been in furtherance of the defendant's First Amendment rights.
We see no logical basis for the trial court's conclusion. On the contrary, the fact the court cannot strike particular allegations from the cause of action logically leads to the conclusion the cause of action must be subjected to SLAPP scrutiny if any of the allegations of conduct giving rise to liability involve conduct in furtherance of the defendant's rights of petition or free speech on a public issue.[27]
Furthermore, to the extent M.G. v. Time Warner is relevant to the issue before us, it supports a conclusion opposite the one the trial court drew here. The plaintiffs in M.G. v. Time Warner argued the identity of the molested players and the molesting coach was the only public issue involved in the case and therefore Time Warner's disclosure of the other players' and coaches' identities was not connected to a "public issue" as required under the first prong of the anti-SLAPP statute. The Court of Appeal rejected this argument and stated "the broad topic of the article and the program was not whether a particular child was molested but rather the general topic of child molestation in youth sports, an issue which, like domestic violence, is significant and of public interest."[28] In other words, the court held even if some of the allegations about the Time Warner article and program arguably did not fall within section 425.16 when viewed in isolation, the statute applied because the "broad topic" of the conduct giving rise to the cause of action was a matter of public interest.
Although the trial court erred in failing to follow our holding in Fox Searchlight,[29] *449 we have taken the opportunity to reexamine our holding in that case. We conclude our holding was correct.
There are three reasons why a SLAPP motion should apply to a cause of action if any predicate act was in furtherance of the defendant's First Amendment rights in connection with a public issue: The language of the statute itself requires such an application. Requiring all the alleged acts of the defendant to be protected activities would allow plaintiffs to evade SLAPP review through artful pleading. And, the arguments in support of the trial court's all-or-nothing approach are not persuasive.
The language of the SLAPP statute supports our holding in Fox Searchlight. Under section 425.16, subdivision (b)(1) a SLAPP motion may be directed to "[a] cause of action against a person arising from any act of that person in furtherance of the person's [First Amendment rights]." (Italics added.) Clearly, a SLAPP motion applies to a cause of action, not the theories supporting the cause of action.[30] Furthermore, a cause of action is subject to challenge if "any act" giving rise to the cause of action was an act in furtherance of the defendant's First Amendment rights. Thus under the plain language of the statute a cause of action is subject to challenge if at least one act of the defendant alleged to give rise to the cause of action was an act in furtherance of the defendant's First Amendment rights. Any doubt about whether the Legislature intended the statute should be construed narrowly to apply only when all the defendant's acts are in furtherance of First Amendment rights or construed broadly to apply when any of the defendant's acts are in furtherance of First Amendment rights is resolved by the Legislature's instruction the provisions of the statute "shall be construed broadly."[31]
In addition, requiring every alleged act giving rise to the cause of action to be an act in furtherance of the defendant's First Amendment rights would effectively nullify the protection against SLAPP suits because the SLAPPer could simply allege a nonprotected act in each cause of action.[32] California's anti-SLAPP legislation, it must be remembered, was enacted to counter "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances ... through abuse of the judicial process."[33] As we pointed out in Wilcox v. Superior Court, the merits of the allegations in the complaint "are not of concern to the plaintiff because "SLAPP suits are brought to obtain an economic advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff."[34] For this reason, "traditional safeguards against meritless accusations (suits for malicious prosecution, abuse of process, requests for sanctions) are inadequate to counter SLAPP's."[35] Thus, if we were to affirm the ruling of the trial court in this case we would invite SLAPP plaintiffs "to disguise the vexatious nature of the suit through ... artful pleading."[36]
*450 In reexamining our holding in Fox Searchlight, we have considered the public policy arguments advanced by the trial court in support of an all-or-nothing approach to the SLAPP statute's "arising from" requirement. We find these arguments unpersuasive.
The trial court reasoned "allegations of nonprotected conduct sufficient to support a claim would appear ... to preclude any finding that the purpose of the cause of action was `primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'"[37] The court's reasoning is faulty in two respects. First, the allegations in a SLAPP suit are virtually irrelevant as explained above and discussed in greater detail in Wilcox.[38] Second, our Supreme Court has held a defendant bringing a SLAPP motion is not required to prove the purpose of the cause of action was to chill the defendant's rights of free speech and petition.[39]
The trial court also criticized our approach to SLAPP suits in Fox Searchlight as "throwing out the baby with the bath water." This criticism is, again, based on two faulty premises. The first premise is that if the cause of action is supported by at least one allegation of nonprotected activity the concerns underlying the SLAPP statute are not implicated. This premise is contrary to the premise underlying the SLAPP statutethe allegations in the complaint are not trustworthy indicia of the complaint's bona fides.[40] The second premise is that in every case in which the first prong is met the cause of action is doomed. This premise ignores the fact "the anti-SLAPP statute does not provide immunity."[41] Even if the defendant establishes the cause of action arises from an act in furtherance of the defendant's First Amendment rights the plaintiff is entitled to proceed with the action if she establishes "a probability [she] will prevail on the claim."[42] In Equilon Enterprises v. Consumer Cause, Inc., our Supreme Court recognized these "substantive and procedural limitations ... protect plaintiffs against overbroad application of the anti-SLAPP mechanism."[43]
Finke cites a statement in Equilon Enterprises which she contends supports the trial court's all-or-nothing interpretation of the statute. In Equilon the court stated: "Most importantly, section 425.16 requires every defendant seeking its protection to demonstrate that the subject cause of action is in fact one `arising from' the defendant's protected speech or petitioning activity."[44] Finke interprets this statement *451 as imposing a butfor test on a defendant seeking protection under the anti-SLAPP statute. The defendant must show that "but for" her conduct in furtherance of her First Amendment rights the cause of action never would have arisen. If the defendant's nonprotected conduct could independently support liability under the cause of action, the allegations of protected activity are mere surplusage and should be ignored by the court in ruling on the motion.
We find no merit to this argument. Equilon did not involve any "mixed" causes of action. The plaintiffs causes of action were based on one act of the defendantthe filing of Proposition 65 intent-to-sue noticeswhich, the court concluded, was in furtherance of the defendant's constitutional rights of speech or petition.[45] Thus the Supreme Court did not address the issue facing us in the case at bench. Furthermore, Finke's but-for test would only make sense if the defendant seeking to come within the anti-SLAPP statute had to establish the cause of action was brought with the intent to chill, or had the effect of chilling, the defendant's First Amendment rights. Our Supreme Court has refused to impose either requirement.[46]
For all the reasons stated above, we hold a defendant may move to strike a cause of action under section 425.16 if at least one of the predicate acts was an act in furtherance of the defendant's right to petition or free speech in connection with a public issue.
Applying this holding to the present case, we conclude Disney established at least one predicate act in each cause of action fell within the protection of section 425.16.
As relevant here, section 425.16, subdivision (e) covers "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a ... judicial body ...; [and] (4) ... any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[47]
Finke's complaint alleges two predicate acts by Disney which singly or in combination gave rise to each of her causes of action(1) defamatory statements concerning her fairness and accuracy in reporting on the Pooh litigation and (2) threats to withdraw advertising and impose other economic sanctions against the Post and other media owned by the Post's parent company unless Finke was fired. Without doubt, these acts constituted "speech" because they were things said, *452 orally or in writing, by Disney. The question is whether this speech was "in connection with" either a "public issue" or an "issue under consideration or review by a ... judicial body."
The trial court reasoned Disney's alleged threats of economic sanctions and its alleged defamatory statement "Finke allowed her biases and/or prejudices to govern her conduct as a reporter" were not protected under section 425.16 because they did not "concern issues in the Pooh action or matters of public interest." We disagree with the court's reasoning.
To qualify for protection under section 425.16, subdivision (e)(2) the defendant's speech need not "concern" an issue in litigation or an issue of public interest. The speech is protected if it is "made in connection with an issue under consideration or review" in a judicial proceeding. (Italics added.) Thus, in Briggs v. Eden Council for Hope & Opportunity our Supreme Court held a defendant moving to strike a cause of action under section 425.16, subdivision (e)(2) "need not separately demonstrate that the statement concerned an issue of public significance."[48] Similarly, in Wilcox v. Superior Court we held a statement is made "in connection with" an issue in a judicial proceeding if the statement is "rationally connected" to the litigation.[49]
Finke's complaint alleges a "rational connection" between Disney's threats and the Pooh litigation: "Disney representatives ... called, visited, and/or wrote to the editor of the Post and the Post's owners to complain about the [Pooh litigation] articles. The purpose of Disney's interference was to silence Finke and to have her terminated from her position at the Post. Disney representatives went so far as to threaten to pull all Disney advertising from the Post and other News Corp. [sic] media outlets if Finke were not fired." Clearly, Disney's alleged threats were made in connection with articles reporting on the discovery sanctions in the Pooh litigation. To hold otherwise would be to arbitrarily divorce the statements from the context in which they were made.
Disney's alleged threats also come within subdivision (e)(4) of the statute which pertains to "any other conduct in furtherance of [free speech] in connection with a public issue or an issue of public interest." Disney's statements were made in connection with two issues of public interestthe Pooh litigation and the fair, accurate and unbiased reporting of the news.
The trial court found, and it is beyond dispute, the Pooh litigation is a matter of public interest. We have already explained why we believe Disney's alleged statements to the Post editors bore a rational connection to the Pooh litigation.[50]
In addition, a strong public interest exists in the accuracy and impartiality of news reporters. With respect to matters in litigation, the United States Supreme Court has recognized there is a "public interest in accurate reports of judicial proceedings."[51] The court reasoned most people cannot observe at first hand the operations of their government. Therefore, they must rely "upon the press to *453 bring to [them] in convenient form the facts of those operations."[52] As a result of this reliance, "[g]reat responsibility is ... placed on the news media to report fully and accurately the proceedings of government" including the courts.[53] "With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."[54]
California has recognized this public interest by adopting an absolute privilege for the fair and accurate reporting of judicial proceedings.[55] The purpose of the fair and accurate reporting privilege is to ensure the public interest is served by the dissemination of information about events occurring at public proceedings and public meetings.[56]
It is no answer to argue the public interest in fair and accurate reporting is not implicated in the present case because one of the litigants, not the reporter, is asserting the interest. This argument improperly focuses on the legitimacy of Disney's conduct and thus confuses the question whether the SLAPP statute applies with the question whether Finke has a probability of success on the merits.[57]
Disney's alleged defamatory statements about Finke also fall within subdivision (e)(2) and (4).
The trial court reasoned subdivision (e)(2) did not apply because the alleged defamatory statements were not made in connection with an issue in the Pooh litigation but in connection with Finke's fairness and accuracy in reporting on the Pooh litigation. But, as we pointed out above, Disney's attack on Finke's fairness and accuracy did not occur in a vacuum. It occurred in the context of her reporting on the Pooh litigation and cannot reasonably be divorced from that context. Therefore, Disney's alleged defamation falls within subdivision (e)(2)'s protection for statements made in connection with an issue under consideration or review by a judicial body.
Furthermore, subdivision (e)(4) applies because Disney's alleged statements disparaged Finke as a news reporter and, as discussed above, fairness and accuracy in news reporting is an issue of public interest.
Having concluded Finke's causes of action fall within the ambit of section 425.16 we proceed to the second prong of the *454 statutewhether Finke has established a probability of success on the merits as to any of her claims.[58]

II. FINKE HAS ESTABLISHED A PROBABILITY OF SUCCESS ON HER CAUSES OF ACTION FOR LIBEL AND INFLICTION OF EMOTIONAL DISTRESS.

Once the defendant establishes the SLAPP statute applies, the burden shifts to the plaintiff to "establish" a "reasonable probability" of success on the merits of her claim.[59] The plaintiff establishes a reasonable probability of success on the merits by "demonstrat[ing] the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."[60] Where applicable, the plaintiff must also "meet the defendant's constitutional defenses."[61] Our Supreme Court has stated the plaintiff meets her burden by showing her claims have at least "minimal merit"[62] and we have held that in order to satisfy due process "the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard ... and the limited opportunity to conduct discovery. ..."[63]
Establishing a prima facie case of defamation (libel or slander) involving the plaintiffs trade or profession generally requires proof the defendant made a defamatory statement concerning the plaintiffs practice of her trade or profession, the statement was published, the defendant acted with some degree of fault, and damages.[64] Furthermore, because this case involves matters of public interest, Finke bears the burden of proving the statements at issue are false.[65] And, if Finke is a "public figure" she bears the additional burden of proving by clear and convincing evidence Disney acted with malice.[66]
To establish the first two elements, the making of defamatory statements and their publication, Finke relies on three documents: a letter from Disney's president, Robert Iger, to Col Allan, the New York Post's editor-in-chief; an e-mail from Cynthia Cotts, a reporter for the Village Voice, to Finke's attorneys quoting statements allegedly made to Cotts by Daniel Petrocelli, Disney's attorney in the Pooh *455 litigation; and an article in the Village Voice written by Cotts reporting statements allegedly made to her by Petrocelli and by John Dryer, Disney's spokesperson.
The Iger letter was initially offered by Disney to meet its burden of proving its speech was in connection with a judicial proceeding or an issue of public interest. Finke objected to the admission of the letter for this purpose on the ground the letter was not properly authenticated. The trial court sustained Finke's objection. Neither Finke's objection nor the trial court's ruling, however, precludes us from considering the contents of the Iger letter in connection with the second prong of the SLAPP motion, whether Finke has a reasonable probability of success on the merits of her claims. As previously explained, we apply de novo review to the issue of Finke's probability of success on the merits. Even if the authenticity of the letter was questionable when offered by Disney in support of an issue on which Disney had the burden of proof, authenticity is not an issue when the letter is offered by Finke in support of an issue on which she has the burden of proof. Surely an author cannot be heard to object to the authenticity of a letter he himself has previously offered into evidence. Finally, there is no prejudice to Disney in our considering the Iger letter. The letter's significance has been thoroughly briefed by both parties in the trial court and both parties have relied on the letter in their briefs on appeal.
The Cotts e-mail and the Village Voice article do not fare as well. Disney objected to these documents on the grounds of hearsay and lack of authentication. We find the hearsay objections well taken and therefore we need not address the authentication objections.
The e-mail and article are hearsay because both are out-of-court statements by Cotts offered to prove Petrocelli and Dryer actually made the remarks attributed to them in the e-mail and the article. Finke has not suggested nor have we found any hearsay exception which would be applicable to Cotts' assertions.
Therefore, in considering whether Disney agents made defamatory statements about Finke our review is limited to the Iger letter.[67]
A written communication to a third party is libelous if it is false, unprivileged, and exposes the subject of the communication to "hatred, contempt, ridicule, or obloquy, or ... causes him to be shunned or avoided, or ... has a tendency to injure him in his occupation."[68]
Iger's letter to Allan states Finke's reporting on the discovery proceedings in the Pooh litigation "includes serious misrepresentations clearly designed to injure the Walt Disney Company;" contains "a gross misstatement of the facts" and an "absolute distortion" of the court records; is "absolutely false" in describing one court order and "grossly mischaracterized" another. The letter concludes by stating Finke's reporting constituted an "inaccurate, misleading and unbalanced account of the court proceedings."
Iger's accusation Finke deliberately misrepresented the facts in order "to injure the Walt Disney Company," and his calling her reporting an "absolute distortion" of the record and "absolutely false" are statements of facts which, at a minimum, have "a tendency to injure [Finke] in [her] occupation" *456 as a news reporter.[69] Deliberately slanting an article with the intent to injure a person and knowingly making statements which are "absolutely false" is clearly unethical behavior on the part of a journalist. "There can be no doubt that a statement charging a journalist with conduct which is generally regarded as unethical under accepted journalistic standards would have a tendency to cause professional injury."[70]
Disney contends even if some of Iger's language might support a cause of action for libel, Finke has not demonstrated she can prove the statements were false, made with malice, or that she can overcome the privileges applicable to Iger's statements.
It would serve no useful purpose to detail all of the evidence submitted by Finke on the issue of falsity. Suffice it to say we have reviewed the discovery sanction orders in the Pooh litigation, Finke's articles, Finke's declaration, and the declarations submitted on Finke's behalf,[71] and have concluded Finke has shown a reasonable probability of proving Iger's allegations she made false statements in her articles are themselves false.
Disney contends Iger's statements were privileged under Civil Code section 47, subdivisions (b), (c) and (d) and under a constitutional or common law right of fair comment. We disagree.
Civil Code section 47, subdivision (b), commonly known as the litigation privilege, protects a communication made in "any ... judicial proceeding...." The privilege applies to any communication made in the course of, or in anticipation of, litigation by a litigant or potential litigant to another litigant or potential litigant having a logical connection to the litigation.[72]
Disney concedes it was not in litigation with the Post when Iger wrote to Allan but it points out the litigation privilege has been held to apply to prelitigation demand letters.[73] Iger's letter to Allan, however, cannot be fairly characterized as a prelitigation demand letter. Neither Iger nor Allan are attorneys (at least there is no evidence in the record they were acting as such in connection with the Pooh articles). Iger's letter did not set out the legal bases which would support litigation by Disney against the Post nor did it threaten legal action unless specific demands, such as a retraction, were met.[74]
The litigation privilege is unavailable to Disney for the additional reason it "does not apply where publication is to persons in no way connected with the proceeding."[75]
Disney argues the letter to Allan falls within the public policy of the litigation privilege to "promote[ ] the effectiveness of judicial proceedings by encouraging attorneys *457 to zealously protect their clients' interests."[76] Iger's letter protected Disney's interests, Disney maintains, because it "blunt[ed] any effect the erroneous stories would have not only on the jury pool, but on the appellate bench at a time when critical appellate proceedings regarding issues discussed in the Post stories were in progress." We are not persuaded. As previously noted, Iger is not an attorney and his letter does not request a retraction or correction of Finke's articles. Furthermore, we believe it is highly unlikely any potential juror in Los Angeles, where the Pooh litigation is pending, reads the New York Post or any appellate justice considering the discovery issues in the Pooh litigation would be influenced by the Post's articles.
Disney's reliance on Civil Code section 47, subdivision (c), the "common interest" privilege, is also unavailing.
The common interest privilege applies to "a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."[77] The privilege is conditional and can be defeated by proof of malice or other abuse.[78]
Initially, we note the common interest privilege does not correspond to "a broad `public interest privilege'" protecting communications merely because they pertain to matters of general public interest or concern.[79] Rather, the common interest between the defendant and the person receiving the communication must be a pecuniary or proprietary one.[80] Thus, the fact the Pooh litigation and fairness in reporting are matters of "public interest" for purposes of section 425.16[81] does not mean communications on these subjects are necessarily matters of "common interest" for purposes of Civil Code section 47, subdivision (c).
Disney contends the common interest privilege applies to the Iger letter because Disney and the Post have a common interest in the accuracy of the Post's reports on the Pooh litigation and because the Post asked Iger to "detail specific errors" in Finke's reporting.
Granting both the Post and Disney are interested in fair and accurate reporting of the Pooh litigation, we do not believe this shared interest qualifies as a "common" interest for purposes of Civil Code section 47, subdivision (c). The Post's interest in fair and accurate reporting of the Pooh litigation derives from its more general interest in the fair and accurate reporting of all its storiesbusiness, entertainment, politics, weather, sports and so on. Disney, on the other hand, is primarily, if not exclusively, interested in fair and accurate reporting about Disney. The mere fact *458 the interests of the Post and Disney may occasionally overlap does not give rise to common interest protection for Disney's communications to the Post. As our Supreme Court explained in Brown v. Kelly Broadcasting Co., the legislative history of Civil Code section 47, subdivision (c) "indicates the Legislature intended to codify the narrow common law privilege of common interest...."[82] The interest protected at common law "was private or pecuniary; the relationship between the parties was close, e.g., a family, business, or organizational interest; and the request for information must have been in the course of the relationship."[83]
Disney argues complaints made to an employer regarding the conduct of one of its employees "are at the core of the privilege," citing Martin v. Kearney, a case in which the court held letters from parents to the school principal questioning the plaintiffs fitness to teach fell within the common interest privilege.[84] In Martin, however, there existed the equivalent of a business or professional relationship between the school principal and the parents of the school's students. No such relationship existed between the Post and Disney.
Nor do we find any merit in Disney's contention the Iger letter falls within subdivision (c)(3) because Iger wrote it in response to Allan's request for details of the specific errors in Finke's articles. After Finke's articles appeared, Disney representatives contacted the Post personally or by telephone to complain about the accuracy of Finke's reporting and give their version of the Pooh discovery proceedings. Allan, the Post's editor, asked Disney to put its position in writing. Iger did so in his letter to Allen. Thus it was Disney, not the Post, which initiated the subject of errors in Finke's articles. Having itself triggered the subject, Disney cannot bootstrap its subsequent defamatory statements into privileged communications on the ground it was merely responding to the Post's request for more information.
Disney next asserts the defamatory statements in Iger's letter are protected by the "fair and true" reporting privilege of Civil Code section 47, subdivision (d). Under this statutory provision a communication is absolutely privileged if it is "a fair and true report in, or a communication to, a public journal, of ... a judicial ... proceeding. .. ."[85] The purpose of the privilege is to protect not only fair and true reports of judicial proceedings in public journals but fair and true reports of judicial proceedings to public journals.[86]
Disney maintains Iger's statements to Allan about what transpired in the Pooh discovery proceedings was a "true and accurate report" of those proceedings as such term has been defined by the courts.[87]
*459 Disney's reliance on subdivision (d) fails, however, because the defamatory statements are only protected if they are contained in the report on the judicial proceedings, not if they are the collateral observations of the reporter. For example, if the reporter states "At trial Mr. Jones, a known Communist and child-molester, testified the light was green when he entered the intersection" the reporter may be liable for defamation for calling Jones a Communist and child-molester even though she reported fairly and accurately the testimony Jones gave in the proceeding. In the case before us the statements at issue were not part of Iger's own report on the Pooh discovery proceedings but occurred in his criticism of Finke's report on the Pooh discovery proceedings. Thus, while subdivision (d) may protect Finke from a defamation suit by Disney based on her reporting of the Pooh litigation, it does not protect Disney in its report on Finke's report.
In addition to the privileges recognized in Civil Code section 47, Disney relies on what it deems to be a constitutional privilege of self-help citing Justice Powell's observation in Gertz v. Robert Welch, Inc.: "The first remedy of any victim of defamation is self-helpusing available opportunities to contradict the lie or correct the error and thereby minimize its adverse impact on reputation."[88] A conditional self-help privilege is recognized in the Restatement Second of Torts which states: "An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that ... (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the [publisher's] interest."[89] In a comment to clause (b) the Restatement explains: "A conditional privilege exists under the rule stated in this Section when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself. The privilege here is analogous to that of self-defense against battery, assault or false imprisonment.... Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar."[90]
The "self-help" privilege is no help to Disney for two reasonsthe principal one being California does not recognize "self-help" as an independent privilege. Rather, it is incorporated into the common interest privilege of Civil Code section 47, subdivision (c).[91] We have previously held the common interest privilege does not apply to this case.[92] Furthermore, even if we were to recognize "self-help" as an independent privilege it only arises if the plaintiff has first defamed the defendant. Disney does not claim Finke's articles defamed it.
*460 For the reasons explained above we conclude the contents of at least some of Iger's statements support a cause of action for libel, none are privileged and Finke has a reasonable probability of showing the statements are false.
We turn, finally, to the question whether Finke is a public figure required to prove malice in order to prevail on her claim of libel.
Public figures come in two forms: the all-purpose public figureone who has achieved such pervasive fame or notoriety as to become a public figure for all purposes and in all contextsand the limited-purpose public figureone who injects herself or is drawn by others into a particular public controversy and thereby becomes a public figure as to her role in that controversy.[93]
There are two rationales for treating public figures differently from private persons. First, "public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy."[94] Second, public figures for the most part are persons who have assumed prominent roles in society. "Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."[95] In either case, the courts have reasoned public figures have invited the attention and comment they receive and must accept certain necessary consequences of their choice including the risk false and injurious statements will be made about them.[96]
The Supreme Court, in Gertz, suggested there may be a third type of public figurethe involuntary public figurealthough it noted "the instances of truly involuntary public figures must be exceedingly rare."[97]
We have found no California case which has addressed the issue of whether a news reporter was a public figure for purposes of a defamation action based on the reporter's professional activities.[98] In other jurisdictions courts have found some reporters to be all-purpose public figures because they were so well known to the public.[99] Courts have also found some journalists to be at least limited-purpose public figures because they wrote regularly-appearing columns in which they expressed their personal point of view on *461 issues of public interest.[100] Finally, some "investigative" journalists have been held to be limited-purpose public figures because they injected themselves into a public controversy.[101]
Despite her self-description as "one of the country's leading entertainment business journalists," we do not find Finke qualifies as an all-purpose public figure.
As previously noted, one reason for setting a higher hurdle for all-purpose public figures is the assumption such individuals, because of their status, enjoy easy access to the media and consequently have a "realistic opportunity" to counter false statements made about them.[102] Thus, newspaper publishers and editors may fairly be treated as public figures for all purposes because they are usually well-known in their communities and because they have the ability to counter false statements made about them by publishing their rebuttals in their own papers.[103]
Although Finke may be regarded by her peers as a "leading entertainment business journalist" there is no evidence she is well known either in Los Angeles, where she resides, or in New York where her articles are published. Furthermore, at all times relevant to this action, Finke was a news reporter employed by the Post. All of her story topics, including the Pooh litigation, were assigned to her by the Post's business editor. Unlike a columnist or a host of a television or radio program, Finke had no independent access to the media by which to counter Disney's accusations against her.
A second reason for treating all-purpose public figures differently from private individuals is based on the view those "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention ... invite attention and comment" and must accept the fact some of the attention and comment will be unpleasant, critical or even defamatory.[104]
Although the evidence shows Finke has had a long career in journalism and has covered numerous important and controversial stories, there is no evidence she has ever sought or received notoriety or public attention by reason of her achievements. There is, for example, no evidence Finke has appeared on television news or talk shows, testified before Congress, given widely reported speeches or done anything else to make herself newsworthy. We feel very confident a poll of potential jurors in this case would reveal none of them had ever heard of Finke.
*462 Nor can Finke justly be characterized as a limited-purpose public figure.
Limited-purpose public figures are those who have thrust themselves before the public in order to influence the resolution of a particular public controversy.[105] In Knudsen v. Kansas Gas and Elec. Co., for example, a free-lance reporter wrote a story published by a Kansas City newspaper in which he discussed a public utility's policy regarding public access to Wolf Creek, a lake owned by the utility. A representative of the utility company met with the newspaper's editor-in-chief and associate editors to complain about alleged inaccuracies in the story. At the meeting the utility company representative allegedly made defamatory statements about Knudsen, the reporter. Knudsen sued the utility for slander. On appeal from a summary judgment for the utility the court first addressed the question whether Knudsen was a public figure.
Knudsen conceded access to Wolf Creek was a public issue but argued he did not become a public figure merely by authoring an article on the issue and that his exposure to the issue was "involuntary." The Kansas Supreme Court disagreed and affirmed the trial court's determination the reporter was a limited-purpose public figure with respect to the issue of public access to the lake. The court reasoned: "Knudsen, a free-lance writer, was not assigned to write the article by an employer. Rather, after defining the topic of the article, he initiated the investigation. Knudsen should have realized that his article about Wolf Creek would create a legitimate concern not only for KG & E but also for the public at large. He wrote the article under his byline in an investigatory tone to create a public controversy and influence the issue of the public's right to use Wolf Creek.... By his choice, Knudsen voluntarily injected himself into the public's attention and caused KG & E's concern."[106]
Knudsen is factually distinguishable from the case before us in several significant respects. Unlike Knudsen, Finke did not initiate the articles in question nor did she chose the topics to be reported. The articles and topics were assigned to her by her editor at the Post. Finke testified without contradiction: "[I]f it were not for the fact that [my editor] had assigned me the story, I would not have written it." Furthermore, Finke did not write the articles in "an investigatory tone." And, unlike Knudsen, Finke did not write the articles in a way to create a public controversy or influence the public's perception of Disney or its legal counsel. Finke testified, for example, the reference to Disney's shredding of documents was added by the Post editorial staff, it was not part of her article as written. Finke also testified the reference in the article to the Arthur Anderson accounting firm, which had been involved in a shredding scandal, was suggested by Disney's counsel in the Pooh litigation in an interview Finke conducted in preparing the article.
Finally, Finke cannot be categorized as an involuntary public figureone who, without intending to, has acquired such public notoriety as to be fairly equated with all-purpose and limited-purpose public figures.[107]
In Khawar v. Globe Internal, Inc. our Supreme Court held that even assuming a *463 person may be accurately characterized as an involuntary public figure for purposes of a defamation action, this characterization must be reserved for an individual "who, despite never having voluntarily engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements."[108]
Nothing in the record of the case before us demonstrates Finke acquired any significant public recognition or media access as a result of her articles on the Pooh litigation. While it is true an article appeared in the Village Voice reporting some of Disney's statements and Finke's firing by the Post, Finke was not interviewed for this story and it appeared after the damage was done. Obviously Disney cannot by its own conduct create a defense to defamation by making the plaintiff a public figure.[109]
In conclusion, we believe Finke has established a reasonable probability of prevailing on her cause of action for libel.[110]
The evidence supporting the libel cause of action together with evidence of Finke's physical and emotional pain and suffering also demonstrate a reasonable probability she will prevail on her causes of action for intentional or negligent infliction of emotional distress depending on whether she establishes at trial Disney's defamatory statements were made intentionally or negligently.

III. FINKE HAS ESTABLISHED A REASONABLE PROBABILITY OF PREVAILING ON HER CAUSES OF ACTION FOR INTENTIONAL AND NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS AND INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

Establishing a prima facie case of intentional interference with contractual relations requires proof of "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."[111] The elements of a cause of action for intentional interference with prospective business advantage are essentially the same except instead of showing a contract the plaintiff shows an economic relationship with a third party with the probability of future economic benefit to the plaintiff.[112] The courts have held a plaintiffs interest in a continued contractual relationship or in prospective economic advantage may be protected against injury caused by negligence as well as by intentional conduct.[113]
*464 As to the intentional interference torts, Finke's undisputed declaration establishes she had a valid contract and an economic relationship with the Post, Disney knew about this association, the Post fired Finke and ended their economic relationship after Disney's defamatory statements in the Iger letter, and the loss of her association with the Post resulted in economic, physical and emotional injury.
Finke did not submit any direct evidence Disney sent the Iger letter to the Post with the intent to disrupt the contractual and economic relationship between the Post and Finke, but she did not have to. As recognized in Savage v. Pacific Gas & Electric Co., a jury may infer culpable intent from conduct "substantially certain to interfere with the contract [or prospective economic relationship]."[114] Savage was a reporter for the Energy User News. The News fired her after a PG & E executive made a defamatory statement to the paper's editor-in-chief Savage was a member of, and an active participant in, an organization opposing PG & E policies while at the same time reporting on PG & E policiesa serious breach of journalistic ethics.[115] Reversing a summary judgment for PG & E on Savage's causes of action for intentional interference with contract and economic advantage, the Court of Appeal held a jury could "reasonably find that the PG & E executive's conduct was substantially certain to interfere with appellant's interests, and infer culpable intent from this fact." [116]
Therefore, if a jury finds Disney made statements to the Post defaming Finke as a reporter, knowing the statements were false, it could also find Disney made the statements with the intent to disrupt the contractual and economic relationship between the Post and Finke. Indeed, the circumstantial evidence of intentional interference in this case is stronger than in Savage. Here Finke has provided evidence of a motive for Disney's alleged interference in her relationship with the Post. The Pooh litigation articles appeared in the Post on January 29, 2002. The Post fired Finke three weeks later, on the same day as the annual Disney shareholders' meeting. A trier of fact could reasonably infer Disney engaged in a campaign of defamation against Finke in order to cause her to be terminated by the Post before the Disney shareholders' meeting so that Disney management could put a favorable "spin" on the Pooh discovery proceedings and point to Finke's firing as evidence a less favorable report on the proceedings was not trustworthy.
Even if the jury should determine Disney was only negligent in communicating defamatory statements about Finke to the Post the jury could nevertheless find Disney liable for negligent interference with contractual relations because it was reasonably foreseeable to Disney the nature of its accusations against Finke would result in her termination from employment.[117] Evidence the Iger letter was the *465 proximate cause of Finke's firing is found in her editor's statement to her she "was being fired because of the Pooh litigation articles."[118]
For these reasons we find Finke has established a reasonable probability of prevailing on her causes of action for intentional and negligent interference with contractual relations and intentional interference with prospective economic advantage.

IV. FINKE HAS NOT ESTABLISHED A REASONABLE PROBABILITY OF PREVAILING AGAINST DISNEY ON HER CAUSE OF ACTION FOR UNLAWFUL BUSINESS PRACTICES.

Finke alleges Disney and News Corporation, Ltd. (News Corp), the owner of the New York Post, have formed an "unholy alliance" to conceal Disney's financial position and the facts concerning the Pooh litigation from Disney shareholders and the public in general. Finke claims to be a victim of this alliance. She maintains the campaign of defamation against her and her firing were part of Disney's and News Corp's effort to "`spin' news as they wish."
The record contains no evidence to support Finke's allegations against Disney. Therefore the motion to strike the cause of action for unlawful business practice must be granted as to Disney.[119]

DISPOSITION
The order denying Disney's special motion to strike under section 425.16 is reversed. The cause is remanded to the trial court with directions to enter a new and different order granting the motion as to the cause of action for slander and the cause of action for unfair business practices as to Disney only and to deny the motion in all other respects. Respondent is awarded her costs on appeal.
We concur: WOODS, J., and MUNOZ (AURELIO), J.[*]
NOTES
[1] Code of Civil Procedure section 425.16, subdivision (b)(1). All future statutory references are to the Code of Civil Procedure unless otherwise specified. For a detailed discussion of this legislation to protect against "strategic lawsuits against public participation" (SLAPPs) see our decision in Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 33 Cal. Rptr.2d 446.
[2] Fox Searchlight Pictures, Inc. v. Paladino (2001) 89 Cal.App.4th 294, 308, 106 Cal. Rptr.2d 906, footnote omitted; hereafter Fox Searchlight.
[3] Stephen Slessinger. Inc. v. The Walt Disney Corp. (Super. Ct. Los Angeles County No. BC022365), hereafter "the Pooh litigation."
[4] An order granting or denying a SLAPP motion is separately appealable. (Section 425.16, subdivision (j).)
[5] Section 425.16, subdivision (b)(1); Navellier v. Sletten (2002) 29 Cal.4th 82, 88, 124 Cal. Rptr.2d 530, 52 P.3d 703.
[6] Kids Against Pollution v. California Dental Assn. (2003) 108 Cal.App.4th 1003, 1018, 134 Cal.Rptr.2d 373 (hereafter Kids Against Pollution ); Roberts v. Los Angeles County Bar Assn. (2003) 105 Cal.App.4th 604, 612-613, 129 Cal.Rptr.2d 546; Simmons v. Allstate Ins. Co. (2001) 92 Cal.App.4th 1068, 1073, 112 Cal.Rptr.2d 397.
[7] Section 425.16, subdivision (b)(1); Shekhter v. Financial Indemnity Co. (2001) 89 Cal. App.4th 141, 150, 106 Cal.Rptr.2d 843.
[8] Fox Searchlight, supra, 89 Cal.App.4th at pages 307-308, 106 Cal.Rptr.2d 906.
[9] Fox Searchlight, supra, 89 Cal.App.4th at page 308, 106 Cal.Rptr.2d 906.
[10] Fox Searchlight, supra, 89 Cal.App.4th at page 308, 106 Cal.Rptr.2d 906, footnote omitted.
[11] Kids Against Pollution v. California Dental Assn., supra, 108 Cal.App.4th at pages 1016-1017, 134 Cal.Rptr.2d 373. (This opinion was filed after the trial court's ruling in the present case.) And see Lieberman v. KCOP Television, Inc. (2003) ___ Cal.App.4th___, 1 Cal.Rptr.3d 536, [2003 Daily Journal D.A.R. 7424, 7425] [even assuming "unlawful" news-gathering is not protected by the First Amendment, allegations of such unlawful conduct do immunize the complaint from SLAPP review].
[12] Kids Against Pollution, supra, 108 Cal. App.4th at pages 1012, 1014-1015, 134 Cal. Rptr.2d 373.
[13] Kids Against Pollution, supra, 108 Cal. App.4th at page 1018, 134 Cal.Rptr.2d 373.
[14] Kids Against Pollution, supra, 108 Cal. App.4th at pages 1018-1019, 134 Cal.Rptr.2d 373. The Court of Appeal concluded, however, the plaintiffs had not demonstrated a probability of success on the merits and therefore reversed the trial court's order denying the motion. (Id. at pp. 1019-1027, 134 Cal. Rptr.2d 373.)
[15] M.G. v. Time Warner, Inc. (2001) 89 Cal. App.4th 623, 107 Cal.Rptr.2d 504.
[16] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 626, 107 Cal.Rptr.2d 504.
[17] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 626, 107 Cal.Rptr.2d 504.
[18] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 626, 107 Cal.Rptr.2d 504.
[19] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at pages 627-628, 107 Cal.Rptr.2d 504, footnotes and citations omitted.
[20] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 629, 107 Cal.Rptr.2d 504.
[21] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at pages 629-637, 107 Cal.Rptr.2d 504.
[22] See discussion at page 445, ante.
[23] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 629, 107 Cal.Rptr.2d 504. "Although plaintiffs have pleaded ... various theories as separate causes of action, they are all based on identical facts...." (Id. at p. 630, 107 Cal.Rptr.2d 504.)
[24] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 629, 107 Cal.Rptr.2d 504.
[25] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 627, 107 Cal.Rptr.2d 504.
[26] M.G. v. Time Warner, Inc., supra, 89 Cal. App.4th at page 628, 107 Cal.Rptr.2d 504.
[27] Obviously a SLAPP motion cannot be based on "the mere mention of [a] protected activity" in the complaint. Kids Against Pollution, supra, 108 Cal.App.4th at page 1017, 134 Cal.Rptr.2d 373. An allegation in a personal injury action the defendant driver was discussing the First Amendment with his passenger when he struck the plaintiff in a crosswalk would not trigger a SLAPP inquiry.
[28] M.G. v. Time Warner, supra, 89 Cal. App.4th at page 629, 107 Cal.Rptr.2d 504.
[29] See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.
[30] See discussion at pages 444-445, ante.
[31] Section 425.16, subdivision (a).
[32] Fox Searchlight, supra, 89 Cal.App.4th at pages 307-308, 106 Cal.Rptr.2d 906.
[33] Section 425.16, subdivision (a).
[34] Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 816, 33 Cal.Rptr.2d 446, italics in original, citations omitted.
[35] Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 817, 33 Cal.Rptr.2d 446.
[36] Simmons v. Allstate Ins. Co., supra, 92 Cal.App.4th at page 1073, 112 Cal.Rptr.2d 397.
[37] Quoting from section 425.16, subdivision (a).
[38] See Wilcox v. Superior Court, supra, 27 Cal.App.4th at pages 815-817, 33 Cal.Rptr.2d 446.
[39] Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 57, 68, 124 Cal. Rptr.2d 507, 52 P.3d 685. Although Equilon had not been decided at the time the trial court made its ruling we reached the same conclusion in Fox Searchlight, supra, 89 Cal. App.4th at pages 305-306, 106 Cal.Rptr.2d 906.
[40] See discussion at page 449, ante.
[41] Colt v. Freedom Communications, Inc. (2003) 109 Cal.App.4th 1551, 1557.
[42] Section 425.16, subdivision (b)(1).
[43] Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at page 65, 124 Cal. Rptr.2d 507, 52 P.3d 685, internal quotation marks and citation omitted. The court described these substantive and procedural protections id. at page 66, 124 Cal.Rptr.2d 507, 52 P.3d 685.
[44] Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at page 66, 124 Cal. Rptr.2d 507, 52 P.3d 685.
[45] Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at page 67, 124 Cal. Rptr.2d 507, 52 P.3d 685.
[46] Equilon Enterprises v. Consumer Cause, Inc., supra, 29 Cal.4th at page 68, 124 Cal. Rptr.2d 507, 52 P.3d 685; City of Cotati v. Cashman (2002) 29 Cal.4th 69, 75, 124 Cal. Rptr.2d 519, 52 P.3d 695.
[47] Disney also claims its alleged threats come within subdivision (e)(3) of the statute which covers statements "made in a place open to the public or a public forum in connection with an issue of public interest." In Lafayette Morehouse, Inc. v. Chronicle Publishing Co. (1995) 37 Cal.App.4th 855, 863, footnote 5, 44 Cal.Rptr.2d 46, the court construed the term "public forum," for purposes of the SLAPP statute, as a forum to which the public has uninhibited access and dismissed as "somewhat dubious" the contention a newspaper is such a forum since it is the editors and publishers not the public who retain final authority over what is printed. (But see to the contrary, Damon v. Ocean Hills Journalism Club (2000) 85 Cal.App.4th 468, 476-478, 102 Cal. Rptr.2d 205.) Because we find Disney's statements fall within subdivision (e)(2) and (4) we need not address subdivision (e)(3).
[48] Briggs v. Eden Council for Hope & Opportunity (1999) 19 Cal.4th 1106, 1123, 81 Cal. Rptr.2d 471, 969 P.2d 564, italics in original.
[49] Wilcox v. Superior Court, supra, 27 Cal. App.4th at pages 821-822, 33 Cal.Rptr.2d 446.
[50] See discussion at page 452, ante.
[51] Time, Inc. v. Firestone (1976) 424 U.S. 448, 457, 96 S.Ct. 958, 47 L.Ed.2d 154.
[52] Cox Broadcasting Corp. v. Cohn (1975) 420 U.S. 469, 491, 95 S.Ct. 1029, 43 L.Ed.2d 328.
[53] Cox Broadcasting Corp. v. Cohn, supra, 420 U.S. at pages 491-492, 95 S.Ct. 1029.
[54] Cox Broadcasting Corp. v. Cohn, supra, 420 U.S. at page 492, 95 S.Ct. 1029.
[55] Civil Code section 47, subdivision (d) recognizes a privilege for "a fair and true report in, or a communication to, a public journal, of ... a judicial ... proceeding[.]" This privilege is absolute. Sipple v. Foundation for Nat. Progress (1999) 71 Cal.App.4th 226, 240, 83 Cal.Rptr.2d 677.
[56] Restatement (Second) of Torts, section 611, comment (a).
[57] Compare Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist. (2003) 106 Cal.App.4th 1219, 1234, 132 Cal. Rptr.2d 57 [defendant governmental agency could assert protection of subdivision (e)(4) even though the public issue in question did not involve the defendant agency]; Lieberman v. KCOP Television, Inc., supra, 110 Cal. App.4th at page 165, 1 Cal.Rptr.3d 536 [2003 Daily Journal D.A.R. at page 7425] [In deciding the first prong of the SLAPP statute, "[t]o say that lawful newsgathering is an act in furtherance of one's right to free speech, but unlawful newsgathering is not an act in furtherance of one's right of free speech, begs the question"].
[58] As we explained in Roberts v. Los Angeles County Bar Assn., supra, 105 Cal.App.4th at pages 615-616, 129 Cal.Rptr.2d 546, when the trial court denies a SLAPP motion solely on the ground the action is not one arising from statutorily protected activity and the Court of Appeal reverses that ruling the appellate court proceeds with a de novo review of the issue of success on the merits. See Navellier v. Sletten, supra, 29 Cal.4th at page 95, 124 Cal.Rptr.2d 530, 52 P.3d 703.
[59] Section 425.16, subdivision (b); Wilcox v. Superior Court, supra, 27 Cal.App.4th at page 825, 33 Cal.Rptr.2d 446.
[60] Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 823, 33 Cal.Rptr.2d 446.
[61] Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 824, 33 Cal.Rptr.2d 446.
[62] Navellier v. Sletten, supra, 29 Cal.4th at page 95, 124 Cal.Rptr.2d 530, 52 P.3d 703.
[63] Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 823, 33 Cal.Rptr.2d 446, citations omitted.
[64] 5 Witkin, Summary of California Law, (9th ed. 1988) Torts, section 471 et seq.
[65] Nizam-Aldine v. City of Oakland (1996) 47 Cal.App.4th 364, 373, 375, 54 Cal.Rptr.2d 781; and see Brown v. Kelly Broadcasting Co. (1989) 48 Cal.3d 711, 747, 257 Cal.Rptr. 708, 771 P.2d 406 (dictum).
[66] New York Times v. Sullivan (1964) 376 U.S. 254, 279-280, 84 S.Ct. 710, 11 L.Ed.2d 686.
[67] Publication of the Iger letter is conceded by Disney.
[68] Civil Code section 45.
[69] The parties have not briefed and we need not decide at this stage of the litigation whether Iger's other statements were libelous statements of fact or nonlibelous expressions of opinion.
[70] Savage v. Pacific Gas & Electric Co. (1993) 21 Cal.App.4th 434, 446, 26 Cal.Rptr.2d 305.
[71] Disney submitted no evidence bearing on the truth of the allegations in the Iger letter.
[72] Rothman v. Jackson (1996) 49 Cal.App.4th 1134, 1140-1145, 57 Cal.Rptr.2d 284 (summarizing history and development of litigation privilege).
[73] See for example Aronson v. Kinsella (1997) 58 Cal.App.4th 254, 270, 68 Cal.Rptr.2d 305.
[74] Compare Aronson v. Kinsella, supra, 58 Cal.App.4th at page 270, 68 Cal.Rptr.2d 305.
[75] Susan A. v. County of Sonoma (1991) 2 Cal.App.4th 88, 93, 3 Cal.Rptr.2d 27 [psychologist's disclosure to the press of his evaluation of juvenile held on murder charge was not protected by the litigation privilege].
[76] Silberg v. Anderson (1990) 50 Cal.3d 205, 214, 266 Cal.Rptr. 638, 786 P.2d 365.
[77] Civil Code section 47, subdivision (c).
[78] Kashian v. Harriman (2002) 98 Cal. App.4th 892, 914-915, 120 Cal.Rptr.2d 576; Stockton Newspapers, Inc. v. Superior Court (1988) 206 Cal.App.3d 966, 980, 254 Cal.Rptr. 389.
[79] Kashian v. Harriman, supra, 98 Cal. App.4th at page 914, 120 Cal.Rptr.2d 576; and see Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at page 719, 257 Cal.Rptr. 708, 771 P.2d 406.
[80] Rancho La Costa, Inc. v. Superior Court (1980) 106 Cal.App.3d 646, 665, 165 Cal.Rptr. 347.
[81] See discussion at pages 452-453, ante.
[82] Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at page 727, 257 Cal.Rptr. 708, 771 P.2d 406.
[83] Brown v. Kelly Broadcasting Co., supra, 48 Cal.3d at page 727, 257 Cal.Rptr. 708, 771 P.2d 406.
[84] Martin v. Kearney (1975) 51 Cal.App.3d 309, 312, 124 Cal.Rptr. 281.
[85] Sipple v. Foundation for Nat. Progress, supra, 71 Cal.App.4th at page 242, 83 Cal. Rptr.2d 677.
[86] Rothman v. Jackson, supra, 49 Cal.App.4th at page 1144, footnote 3, 57 Cal.Rptr.2d 284.
[87] The courts have held a person reporting on a judicial proceeding need not be able to "justify every word." So long as the report conveys the "gist and sting" of the proceedings a "slight inaccuracy in the details will not prevent a judgment for the defendant. ..." Sipple v. Foundation for Nat. Progress, supra, 71 Cal.App.4th at page 244, 83 Cal.Rptr.2d 677, citations and internal quotation marks omitted.
[88] Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789, hereafter Gertz.
[89] Restatement Second of Torts, section 594.
[90] Restatement Second of Torts, section 594, comment k.
[91] Emde v. San Joaquin County etc. Council (1943) 23 Cal.2d 146, 154, 143 P.2d 20.
[92] See discussion at pages 457-458, ante.
[93] Gertz, supra, 418 U.S. at pages 344-345, 94 S.Ct. 2997; Reader's Digest Assn. v. Superior Court (1984) 37 Cal.3d 244, 254-255, 208 Cal.Rptr. 137, 690 P.2d 610.
[94] Gertz, supra, 418 U.S. at page 344, 94 S.Ct. 2997.
[95] Gertz, supra, 418 U.S. at page 345, 94 S.Ct. 2997.
[96] See Gertz, supra, 418 U.S. at pages 342, 344-345, 94 S.Ct. 2997.
[97] Gertz, supra, 418 U.S. at page 345, 94 S.Ct. 2997.
[98] In Khawar v. Globe Internat., Inc. (1998) 19 Cal.4th 254, 79 Cal.Rptr.2d 178, 965 P.2d 696 the plaintiff was a photojournalist but the defamatory statements had nothing to do with his occupation.
[99] See e.g., Celle v. Filipino Reporter Enterprises Inc. (2nd Cir.2000) 209 F.3d 163, 177 (plaintiff a "well-known radio commentator within the Metropolitan Filipino-American community"); Maule v. NYM Corp. (1981) 54 N.Y.2d 880, 444 N.Y.S.2d 909, 429 N.E.2d 416, 417 (suit on behalf of estate of Tex Maule, well known sports reporter and author).
[100] See e.g., Rybachek v. Sutton (Alaska 1988) 761 P.2d 1013, 1014 (plaintiff's articles appeared in the "opinion" section of the newspaper, and expressed plaintiff's personal viewpoint on issues concerning natural resources and mining in Alaska); Renner v. Donsbach (W.D.Mo.1990) 749 F.Supp. 987, 991 (plaintiff was a columnist who wrote extensively about fraud in the area of health and nutrition).
[101] Knudsen v. Kansas Gas and Elec. Co. (1991) 248 Kan. 469, 807 P.2d 71, 78 (plaintiff wrote article in "an investigatory tone to create public controversy and influence the issue"); Jensen v. Times Mirror Co. (D.C.Conn.1986) 634 F.Supp. 304, 307, 311-313 (plaintiff was employed as an "investigative reporter" and thrust herself into the story she was covering).
[102] Gertz, supra, 418 U.S. at page 344, 94 S.Ct. 2997.
[103] See Live Oak Publishing Co. v. Cohagan (1991) 234 Cal.App.3d 1277, 1290, 286 Cal. Rptr. 198; Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra, 37 Cal.App.4th at page 863, footnote 5, 44 Cal.Rptr.2d 46.
[104] Gertz, supra, 418 U.S. at pages 342, 345, 94 S.Ct. 2997.
[105] Gertz, supra, 418 U.S. at page 345, 94 S.Ct. 2997.
[106] Knudsen v. Kansas Gas and Elec. Co., supra, 807 P.2d at page 78.
[107] Khawar v. Globe Internat., Inc., supra, 19 Cal.4th at page 265, 79 Cal.Rptr.2d 178, 965 P.2d 696; and see Gertz, supra, 418 U.S. at page 345, 94 S.Ct. 2997.
[108] Khawar v. Globe Internat., Inc. supra, 19 Cal.4th at page 265, 79 Cal.Rptr.2d 178, 965 P.2d 696, italics in original.
[109] Khawar v. Globe Internat., Inc. supra, 19 Cal.4th at page 266, 79 Cal.Rptr.2d 178, 965 P.2d 696.
[110] Because Finke submitted no admissible evidence Disney made oral defamatory statements her cause of action for slander as to that cause of action must be stricken.
[111] Pacific Gas & Electric Co. v. Bear Stearns & Co. (1990) 50 Cal.3d 1118, 1126, 270 Cal. Rptr. 1, 791 P.2d 587.
[112] Pacific Gas & Electric Co. v. Bear Steams & Co., supra, 50 Cal.3d at page 1126, footnote 2, 270 Cal.Rptr. 1, 791 P.2d 587.
[113] J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 803, 157 Cal.Rptr. 407, 598 P.2d 60.
[114] Savage v. Pacific Gas & Electric Co., supra, 21 Cal.App.4th at page 449, 26 Cal. Rptr.2d 305, internal quotation marks and citation omitted.
[115] Savage v. Pacific Gas & Electric Co., supra, 21 Cal.App.4th at pages 443-444, 446, 26 Cal.Rptr.2d 305.
[116] Savage v. Pacific Gas & Electric Co., supra, 21 Cal.App.4th at page 450, 26 Cal. Rptr.2d 305.
[117] Compare Savage v. Pacific Gas & Electric Co., supra, 21 Cal.App.4th at page 450, 26 Cal.Rptr.2d 305 ("The trier of fact could reasonably find that the PG & E executive's conduct" in reporting the plaintiff's conflict of interest to her employer "was substantially certain to interfere with" the plaintiff's employment.).
[118] Whether or not the Post editor's statement would be admissible against Disney at trial, the respondent in a SLAPP motion must be given a certain amount of leeway in establishing a probability of prevailing on a cause of action because of "the early stage at which the motion is brought and heard ... and the limited opportunity to conduct discovery. ..." Wilcox v. Superior Court, supra, 27 Cal. App.4th at page 823, 33 Cal.Rptr.2d 446, citations omitted.
[119] News Corporation, Ltd. is a defendant in this cause of action but did not join in the SLAPP motion.
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.